UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DAEBO INTERNATIONAL SHIPPING      :
CO., LTD. f/k/a DAEBO SHIPPING CO.,   :
LTD.,                                                        :
                                                               :
                        Plaintiff,                        :
                                                               :
            v.                                              :
                                                               :
AMERICAS BULK TRANSPORT LTD.,    :
AMERICAS BULK TRANSPORT            :
(BVI) LTD., PHOENIX BULK CARRIERS :
(US) RI CORP. f/k/a PHOENIX BULK     :
CARRIERS (US) CORP., PHOENIX BULK:
CARRIERS LTD., PHOENIX BULK         :
CARRIERS (BVI) LTD.,                       :
ALLSEAS LOGISTICS BERMUDA        :
LTD. a/k/a BERMUDA ALLSEAS          :
LOGISTICS LTD. a/k/a ALLSEAS         :
LOGISTICS LTD., and BULK OCEAN    :
SHIPPING COMPANY (BERMUDA)      :
LTD. a/k/a BULK OCEAN SHIPPING    :
LTD.,                                                        :
                                                               :
                        Defendants.                     :
-------------------------------------------------------X

12 CV _____



## VERIFIED COMPLAINT

Plaintiff, DAEBO INTERNATIONAL SHIPPING CO., LTD. f/k/a DAEBO SHIPPING

CO., LTD. ("Plaintiff" or "Daebo"), by and through its attorneys, Tisdale Law Offices, LLC, as

and for its Verified Complaint against the Defendants, AMERICAS BULK TRANSPORT LTD.

("ABT"), AMERICAS BULK TRANSPORT (BVI) LTD. ("ABT-BVI"), PHOENIX BULK

CARRIERS (US) RI CORP. f/k/a PHOENIX BULK CARRIERS (US) CORP. ("PBCC"),

PHOENIX BULK TRANSPORT LTD. ("PBCL"), PHOENIX BULK CARRIERS (BVI) LTD.,

("PB-BVI"), ALLSEAS LOGISTICS BERMUDA LTD. a/k/a BERMUDA ALLSEAS

LOGISTICS LTD. a/k/a ALLSEAS LOGISTICS LTD. ("ALLSEAS") and BULK OCEAN

SHIPPING COMPANY (BERMUDA) LTD. a/k/a BULK OCEAN SHIPPING LTD. ("BULK

OCEAN")(hereinafter collectively referred to as "Defendants"), alleges upon information and

belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333.

3.    This is an action for a declaratory judgment pursuant to 28 U.S.C. §§2201-2202

under the Federal Declaratory Judgment Act for the purposes of determining a question of actual

controversy between the parties as more fully set forth below.

4.    At all material times to this action, Plaintiff was and is a foreign company duly

organized and operating under the laws of Korea.  Plaintiff was formerly known as "Daebo

Shipping Co. Ltd."   On January 5, 2010, Daebo Shipping Co. Ltd. merged with Daebo

International Shipping Co. Ltd. *See Daebo International Shipping Co., Ltd.'s Corporate*

*Register noting merger and Plan and Agreement of Merger attached as Exhibit "1."*

5.    Upon information and belief, at all material times, Defendant ABT was a foreign

corporation or other business entity organized and existing under the laws of Liberia.  Upon

information and belief, ABT has been dissolved or is no longer active and its successor in

liability is Americas Bulk Transport (BVI) Limited.

6.    Upon information and belief, at all material times, Defendant ABT-BVI was and

still is a foreign corporation or other business entity organized and existing under the laws of the

British Virgin Islands.

7.    Upon information and belief, at all material times, Defendant PBCC was and still

is a private corporation organized under the laws of the state of Rhode Island and the agent for

both Defendants ABT and ABT-BVI.  Upon information and belief, Phoenix Bulk Carriers (US) Corp. changed its name to Phoenix Bulk Carriers (US) RI Corp. on September 24, 2012.

8.      Upon information and belief, at all material times, Defendant PBCL was and still is a foreign corporation or other business entity organized and existing under the laws of Liberia.

9.      Upon information and belief, at all material times, Defendant PB-BVI was and still is a foreign corporation or other business entity organized and existing under the laws of the British Virgin Islands.

10.      Upon information and belief, at all material times, Defendant ALLSEAS was and still is a foreign corporation or other business entity organized and existing under the laws of the British Virgin Islands. Upon information and belief Defendant Allseas Logistics Bermuda Ltd. is also known as Bermuda Allseas Logistics Ltd. and/or Allseas Logistics Ltd.

11.      Upon information and belief, at all material times, Defendant BULK OCEAN was and still is a foreign corporation or other business entity organized and existing under the laws of Bermuda. Upon information and belief Defendant Bulk Ocean Shipping Company (Bermuda) Ltd. is also known as Bulk Ocean Shipping Ltd.

12.      Pursuant to a time charter party dated January 15, 2008 on an amended BHP Time Form (the "Charter Party"), Daebo agreed to let and ABT agreed to hire the M/V NICOLE (the "Vessel") for a period from January 15, 2008 to a minimum April 14, 2008 and maximum May 27, 2008.

13.      ABT breached the Charter Party by loading a cargo which was not authorized under the charter party and failed to pay hire as required thereunder.

14.     At the conclusion of the Charter Party, Plaintiff submitted its final hire statement to Defendant ABT indicating the amounts still due and owing to the Plaintiff in accordance with the Charter Party.

15.     In breach of the Charter Party and despite due demand, Defendant ABT has not paid $306,234.80 due and owing to the Plaintiff under the Charter Party.

16.     As a result, Plaintiff has suffered damages in the principal sum of $306,234.80 exclusive of interest, court fees and other costs.

17.     Clause 42(b) of the Charter Party provides that any dispute arising thereunder shall be referred to London arbitration with English law to apply.

18.     As a result of ABT's failure to pay the amounts due under the Charter Party, the parties participated in London Arbitration to settle the disagreement.

19.     On March 13, 2012, the London Arbitration Panel awarded Daebo **$306,234.80** in principal, exclusive of interest, costs and attorneys' fees. *A true and accurate copy of the Final Arbitration Award in Daebo's favor is attached hereto as Exhibit "2."*

20.     The Panel also awarded interest thereon at the rate of 4.5% per annum compounded quarterly from August 1, 2008 until the date of payment.

21.     Interest on $306,234.80 at 4.5% per annum compounded quarterly from August 1, 2008 to August 9, 2012 is $60,430.91.

22.     The arbitrators also directed ABT to pay Daebo's costs with compound interest, compounded quarterly.

23.     The arbitrators further directed ABT to pay the costs of the award, £12,155 (approximately $18,760), together with interest at the rate of 4.5% per annum compounded

quarterly from the date of the Award, March 13, 2012, until the date of payment. As of August 9, 2012, the interest on the costs of the award is $343.50.

**DEFENDANTS' RELATIONS**

**I.    ABT, PBCL and PBCC**

24.    Upon information and belief, Defendants PBCL and PBCC are alter egos of Defendant ABT because PBCL and PBCC dominate and disregard its corporate form to the extent that they are actually carrying on the business and operations of ABT as if the same were its own.

25.    Upon information and belief, Defendants PBCL and PBCC have no separate, independent identity from Defendant ABT.

26.    Upon information and belief, Defendants PBCL, PBCC and ABT share common ownership and operation.

27.    Upon information and belief, Defendants ABT PBCC, and PBCL share a common phone number at (401) 846-7790.

28.    Upon information and belief, Defendants PBCC, PBCL and ABT share a common address in Rhode Island, 88 Valley Road, Middletown, RI 02482.

29.    Upon information and belief, Defendants PBCL and ABT also share common addresses in Bermuda, Liberia, and Louisiana: 14 Par La Ville Road, Hamilton, Bermuda; 80 Broad Street, Monrovia, Liberia; and 3867 Plaza Tower Dr., 1st Floor, Baton Rouge, LA 70816.

30.    Upon information and belief, ABT, PBCC, and PBCL share the same website URL: www.bulkcommercialservices.com.    Moreover, www.americasbulktransport.com also

directs to www.bulkcommercialservices.com, which contains tabs linking to information for PBCC, PBCL, and ABT.

31. Upon information and belief, the "management" tab of this website revealed that Edward Coll, Claus Boggild, Peter Koken, and Dieter Greulich are executive officers of the "group" of entities whose information appears on the website. These entities include Defendants ABT, PBCC, and PBCL.

32. Upon information and belief, Defendants ABT, PBCC, and PBCL share common ownership and controlling interests, namely, Edward Coll and Claus Boggild.

33. Upon information and belief, ABT and PBCL comingle their funds and are directing payments to the same account at the Bank of Bermuda in the name of Allseas Logistics Bermuda Ltd. The account bears number 010097574501. *See Exhibits 4 and 6.*

34. A search of the NY State Department of State website revealed that ABT and PBCL share the same registered agent for service of process, Samuel Rein, Esq. *See Search Results from New York State Department of State Attached hereto as Exhibit "3."* PBCC is not registered to do business in New York.

35. In the alternative, Defendants PBCC, PBCL and ABT are affiliated companies such that Defendants PBCC and PBCL are now, or will soon be, holding assets belonging to Defendant ABT and vice versa.

36. In the further alternative Defendants PBCC and PBCL are shell-corporations through which Defendant ABT conducts its business.

**II.   ABT, ABT-BVI and PB-BVI**

37. Upon information and belief, Defendants ABT-BVI and PB-BVI are alter egos of Defendant ABT because ABT-BVI and PB-BVI dominate and disregard its corporate form to the

extent that they are actually carrying on the business and operations of ABT as if the same were its own.

38.     Upon information and belief, Defendants ABT-BVI and PB-BVI have no separate, independent identity from Defendant ABT.

39.     Upon information and belief, Defendants ABT-BVI and PB-BVI share common ownership and operation.

40.     Upon information and belief, Defendants ABT-BVI, PB-BVI and ABT share a principal business addresses in Bermuda and Louisiana at 14 Par La Ville Road, Hamilton, Bermuda and 3867 Plaza Tower Drive, 1st Floor, Baton Rouge, LA 70816.

41.     Upon information and belief, Defendants ABT-BVI and PB-BVI are both BVI companies formed on the same date, June 9, 2008.  Upon further information and belief, ABT-BVI and PB-BVI share a registered address of Palm Grove House, P.O. Box 438, Road Town, Tortola.

42.     Upon information and belief, ABT and ABT-BVI use their names interchangeably.  Upon information and belief, the website shared between ABT, PBCC and PBCL www.bulkcommercialservices.com describes only "Americas Bulk Transport" and makes no distinction between ABT and ABT-BVI.  Furthermore, the website describes only one entity – not two separate (or even two related) Americas Bulk Transport companies.

43.     Upon information and belief, ABT-BVI and PB-BVI share overlapping directors, including Deborah Paterson, Don Dunstan and Arthur Jones.  Upon information and belief, ABT, ABT-BVI and PB-BVI also share overlapping directors, including Don Dunstan, the Chairman/CEO of ABT.  Upon information and belief Arthur Jones is also the Chairman/CEO of PB-BVI.

44.     Upon information and belief, Defendants ABT, PBCC, PBCL, and ABT-BVI share the same controlling director, namely Edward Coll.

45.     Upon information and belief, Mr. Coll represents the interests of ABT-BVI from telephone number (401)-682-7061.

46.     A search of the NY State Department of State website revealed that ABT, ABT-BVI, and PB-BVI share the same registered agent for service of process, Samuel Rein, Esq. *See Search Results from New York State Department of State Attached hereto as Exhibit "3."*

47.     In the alternative, Defendants ABT-BVI, PB-BVI and ABT are affiliated companies such that Defendants ABT-BVI and PB-BVI are now, or will soon be, holding assets belonging to Defendant ABT and vice versa.

48.     In the further alternative Defendants ABT-BVI and PB-BVI are shell-corporations through which Defendant ABT conducts its business.

**III.    ABT and ALLSEAS**

49.     Defendant ALLSEAS is the alter ego of Defendant ABT because ABT dominates and disregards ALLSEAS' corporate form to the extent that ABT is actually carrying on the business and operations of ALLSEAS as if the same were its own.

50.     Upon information and belief, Defendant ALLSEAS has no separate, independent identity from Defendant ABT.

51.     Upon information and belief, Defendants ALLSEAS and ABT share common ownership and operation.

52.     Upon information and belief, Defendants ALLSEAS and ABT share principal business addresses in Bermuda and Louisiana at 14 Par La Ville Road, Hamilton, Bermuda and 3867 Plaza Tower Drive, 1st Floor, Baton Rouge, LA 70816.

53.     Upon information and belief, Deborah Paterson, Arthur Jones and Don Dunstan are executive officers and/or directors of Allseas Logistics Ltd.  Upon information and belief, ABT-BVI and PB-BVI share overlapping directors, including Deborah Paterson, Don Dunstan and Arthur Jones are also directors of ABT-BVI and PB-BVI.  Upon information and belief, ABT and ALLSEAS also share overlapping directors, including Don Dunstan, the Chairman/CEO of ABT.

54.     Upon information and belief, Defendant ALLSEAS acts as paying agent, or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant ABT and/or receive payments being made to Defendant ABT.

55.     Upon information and belief, Defendant ABT uses Defendant ALLSEAS as a "pass through" entity such that it can insulate itself from creditors relating to its commercial obligations.

56.     In a charter party dated April 20, 2007 between ABT and Daebo, Daebo chartered the vessel M/V ANAGEIA from ABT.

57.     Although ALLSEAS was not named in the charter party, and had no formal relationship to the charter of the Vessel, ABT requested that the hire payments under the charter party be made to the account of "ALLSEAS LOGISTICS." *See M/V ANAGEIA fixture recap and wire transfer confirmation attached hereto as Exhibit "4."*

58.     Upon further information and belief, in a charter party dated August 18, 2008 between PBCL and non-party America Metals Trading LLP, PBCL chartered the vessel M/V PLEIADES to America Metals Trading LLP.  PBCC invoiced America Metals Trading LLP and directed that payment be made to the account of "Allseas Logistics Bermuda Ltd." *See M/V PLEIADES fixture recap and invoice with wire details attached hereto as Exhibit "5."*

Page 9 of 14

59.     Upon further information belief, in two other charter parties between PBCL and non-party America Metals Trading LLP, PBCC invoiced America Metals Trading LLP and directed that payment be made to the account of Allseas Logistics Bermuda Ltd." *See invoices with wire details attached hereto as Exhibit "6."*

60.     Upon information and belief, ABT and PBCL are directing payments to the same account at the Bank of Bermuda in the name of Allseas Logistics Bermuda Ltd.  The account bears number 01009754501. *See Exhibits 4 and 6.*

61.     Upon information and belief, ALLSEAS also makes payments on behalf of ABT-BVI.

62.     Upon information and belief, ABT-BVI entered into a charter party with non-party Baumarine A/S for the charter of the vessel M/V IRINI.  Upon information and belief, despite the fact that ALLSEAS was not a party to the charter party, ALLSEAS made payment to Baumarine A/S under the charter party.  Upon information and belief, the invoice was issued from PBCC and states that "on behalf of our Principals, we have instructed Bank of Bermuda…" *See M/V IRINI fixture recap, invoice and wire confirmation attached hereto as Exhibit "7."*

63.     It is not common practice in the maritime industry for an independent company to pay another company's debt, where it has no formal relationship to the underlying charter parties.

64.     A search of the NY State Department of State website revealed that ABT and ALLSEAS share the same registered agent for service of process, Samuel Rein, Esq. *See Search Results from New York State Department of State Attached hereto as Exhibit "3."*

65.     In the alternative, Defendants ALLSEAS and ABT are affiliated companies such that Defendant ALLSEAS is now, or will soon be, holding assets belonging to Defendant ABT and vice versa.

66.     In the further alternative, Defendant ALLSEAS is a shell-corporation through which Defendant ABT conducts its business.

### IV.     BULK OCEAN AND ABT

67.     Upon information and belief, Defendants BULK OCEAN is the alter ego of Defendant ABT because BULK OCEAN dominates and disregards its corporate form to the extent that they are actually carrying on the business and operations of ABT as if the same were its own.

68.     Upon information and belief, Defendant BULK OCEAN has no separate, independent identity from Defendant ABT.

69.     Upon information and belief, Defendants BULK OCEAN and ABT share common ownership and operation.

70.     Upon information and belief, Defendants BULK OCEAN and ABT share a principal business address in Hamilton, Bermuda at 14 Par La Ville Road, Hamilton, Bermuda.

71.     Upon information and belief, BULK OCEAN and ABT share overlapping directors.  Upon information and belief, Don Dunstan, a director of BULK OCEAN, is also a director and/or the Chairman/CEO of ABT.

72.     Upon information and belief, BULK OCEAN also shares overlapping directors with ABT-BVI, PB-BVI and ALLSEAS including, Deborah Paterson, Arthur Jones and Don Dunstan.

73.   Upon information and belief, BULK OCEAN and PBCL share overlapping directors including Trevor J. Williams.

74.   A search of the NY State Department of State website revealed that ABT and BULK OCEAN share the same registered agent for service of process, Samuel Rein, Esq. *See Search Results from New York State Department of State Attached hereto as Exhibit "3."*

75.   In the alternative, Defendants BULK OCEAN and ABT are affiliated companies such that Defendant BULK OCEAN is now, or will soon be, holding assets belonging to Defendant ABT and vice versa.

76.   In the further alternative, Defendant BULK OCEAN is a shell-corporation through which Defendant ABT conducts its business.

77.   Plaintiff alleges and contends that the Defendants are alter egos of each other and as such, debts and liabilities of one of these Defendants is also a debt and liability of each Defendant.

78.   Upon information and belief, Defendants deny that they are alter egos of Defendant ABT, deny any liability for the Award issued against ABT, and have failed to make any payment on the Award despite due demand.

79.   By reason of these conflicting claims, there exists an actual controversy between the parties that is within the jurisdiction of this Court involving the rights and liabilities of the parties to collect and satisfy the final arbitration award issued in Plaintiff's favor which may be determined by a judgment of this Court.

**WHEREFORE**, Plaintiff prays:

A.   That this Court determine and adjudicate that these Defendants are alter egos of each other;

B.     That this Court find and declare that these Defendants are liable to the Plaintiff to satisfy the arbitration award issued in Plaintiff's favor;

C.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

D.     That the Plaintiff have such other, further and different relief as the Court deems just, proper and equitable.

Dated:  October 25, 2012
        New York, NY

DAEBO INTERNATIONAL SHIPPING CO.
LTD., f/k/a DAEBO SHIPPING CO. LTD.,

By: _____
    Thomas L. Tisdale (TT 5263)
    Lauren C. Davies (LD 1980)
    Tisdale Law Offices, LLC
    60 East 42nd Street, Suite 1638
    New York, NY 10165
    Tel:   212-354-0025
    Fax:   212-869-0067
    ttisdale@tisdale-law.com
    ldavies@tisdale-law.com

## ATTORNEY'S VERIFICATION

1.     My name is Lauren C. Davies.

2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff Daebo International Shipping Co. Ltd. f/k/a Daebo Shipping Co. Ltd. (hereinafter "Plaintiff").

4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          October 25, 2012
                Southport, CT

                                        _____
                                        Lauren C. Davies

Page 14 of 14

# EXHIBIT 1

[제41호서식]   공증 **법무법인   대   종**   서울 종로구 당주동 160
인가                        (변호사회관 303호)
[공증부 736-6604]

Registered No. 2012 – 3809

# NOTARIAL CERTIFICATE

## DAE JONG LEGAL CORPORATION

160, Dang Joo-Dong, Jong Ro-Ku,

Seoul, Korea



210mm×297mm(보존용지1종) 70g/m²)

Trans/Corporate Register(Daebo International)

## Corporate Register (including obliteration)

| Registration No. | 384053 |
|---|---|
| Record No. | 110111-3840538 |

| Name | Daebo International Shipping Co., Ltd. |
|---|---|
| Principal Office | 128-27, Dangju-dong, Jongro-gu, Seoul, Korea |

(omitted)

| Value per Share | KRW 5,000 |
|---|---|

| Total Shares to be issued | 20,000,000 shares |
|---|---|

| Total Shares issued and Types and its respective amount | Paid in Capital |
|---|---|
| Total Shares issued    383,824 shares<br>Common shares       383,824 shares | KRW1,919,120,000 |

| Purposes of Business: |
|---|
| 1.    Business for transportation of overseas cargoes;<br>2.    Business for international shipping agencies;<br>3.    Business for forwarding of transportation of overseas cargoes;<br>4.    Business for vessel management<br>5.    Business for forwarding of multi-modal transportations;<br>6.    Business for trading;<br>7.    Subsidiary businesses related to the above. |

| Registered Directors |
|---|
| (omitted) |
| Director   Mr. C. J. Kim 520623-1******<br>Appointed on 1 January 2010          Registered on 5 January 2010 |
| Director   Mr. J. Y. Rho 501004-1******<br>Appointed on 1 January 2010          Registered on 5 January 2010 |
| Director   Mr. H. K. Park 560709-1****** |

| | |
|---|---|
| Appointed on 1 January 2010 | Registered on 5 January 2010 |
| Auditor   Mr. Y. S. Cho 650702-1****** | |
| Appointed on 1 January 2010 | Registered on 5 January 2010 |
| Representative Director Mr. C. J. Kim 520623-1****** | |
| Appointed on 4 January 2010 | Registered on 5 January 2010 |

| **Note** |
|---|
| (omitted) |
| 1. Merger |
| Merged Daebo Shipping Co., Ltd which was located at 128-27, Dangju-dong, Jongro-gu, Seoul, Korea |
|              Registered on 5 January 2010 |

(omitted)

| **Date of Incorporation of the Company**    14 February 2008 |
|---|

| **Reason for Opening of Registry Record and Date:** |
|---|
|   Incorporation                      14 February 2008 |

We hereby certify the genuineness of the contents of this certificate.

17 August 2012

Central Administration office for Registered information, /
Korean Supreme Court Administration Bureau

## 등기사항전부증명서(말소사항포함)[제출용]

| 등기번호 | 384053 |
|---|---|
| 등록번호 | 110111-3840538 |

| 상 호 | 대보인터내셔널쉬핑 주식회사 | |
|---|---|---|
| 본 점 | 서울특별시 종로구 당주동 128-27 동원빌딩 6층 | |
| | 서울특별시 종로구 당주동 128-27 | 2009.11.09 변경<br>2009.11.23 등기 |
| 공고방법 | 서울특별시내에서 발행하는 일간 매일경제신문에 게재한다. | |
| | 이 회사의 공고는 회사의 인터넷 홈페이지(http://www.daebo.co.kr)<br>에 한다. 다만, 전산장애 또는 그 밖의 부득이한 사유로 회사의 인터<br>넷 홈페이지에 공고를 할 수 없는 때에는 서울특별시내에서 발행되는<br>매일경제신문에 게재한다. | 2012.03.23 변경<br>2012.03.26 등기 |

| 1주의 금액   금 5,000 원 | |
|---|---|

| 발행할 주식의 총수 800,000 주 | |
|---|---|
| 20,000,000 주 | 2009.01.16 변경<br>2009.01.19 등기 |

| 발행주식의 총수와<br>그 종류 및 각각의 수 | 자본의 총액 | 변 경 연 월 일<br>등 기 연 월 일 |
|---|---|---|
| 발행주식의 총수      200,000 주<br>보통주식        200,000 주 | 금 1,000,000,000 원 | |
| 발행주식의 총수      383,824 주<br>보통주식        383,824 주 | 금 1,919,120,000 원 | 2010.01.05 변경<br>2010.01.05 등기 |

| 목          적 |
|---|
| 1. 해상화물운송업<br>2. 국제해운대리업<br>3. 해상화물운송주선업<br>4. 선박관리업<br>5. 복합운송주선업<br>6. 무역업<br>7. 각 호에 관련된 부대사업일체 |

| 임원에 관한 사항 |
|---|
| 이사 노재영 501004-1******<br>　　2009 년 12 월 31 일 사임      2010 년 01 월 05 일 등기 |
| 이사 김창중 520623-1******<br>　　2008 년 12 월 26 일 사임      2008 년 12 월 26 일 등기 |
| 이사 임봉호 570121-1******<br>　　2008 년 12 월 30 일 사임      2009 년 01 월 02 일 등기 |

[인터넷 발급] 문서 하단의 바코드를 스캐너로 확인하거나, 인터넷등기소(http://www.iros.go.kr)의
발급확인 메뉴에서 발급확인번호를 입력하여 위·변조 여부를 확인할 수 있습니다.
발급확인번호를 통한 확인은 발행일부터 3개월까지 5회에 한하여 가능합니다.

0000525043157014880321110120610 1B9DABFEBC1F819670917 I 발행일:2012/08/17

발급확인번호 0535-AAMY-XYSV

- 1/6 -

| 등기번호 | 384053 |
|---|---|

감사 조영섭 650702-1\*\*\*\*\*\*
    2009 년 12 월 31 일 사임    2010 년 01 월 05 일 등기

대표이사 노재영 501004-1\*\*\*\*\*\* 서울특별시 서초구 서초동 1446-11 현대슈퍼빌 디-1401
    2009 년 12 월 31 일 사임    2010 년 01 월 05 일 등기

이사 박정자 381205-2\*\*\*\*\*\*
    2008 년 12 월 26 일 취임    2008 년 12 월 26 일 등기
    2009 년 12 월 31 일 사임    2010 년 01 월 05 일 등기

이사 오자은 540607-2\*\*\*\*\*\*
    2008 년 12 월 30 일 취임    2009 년 01 월 02 일 등기
    2009 년 12 월 31 일 사임    2010 년 01 월 05 일 등기

사내이사 김창중 520623-1\*\*\*\*\*\*
    2010 년 01 월 01 일 취임    2010 년 01 월 05 일 등기

사내이사 노재영 501004-1\*\*\*\*\*\*
    2010 년 01 월 01 일 취임    2010 년 01 월 05 일 등기

사내이사 박형규 560709-1\*\*\*\*\*\*
    2010 년 01 월 01 일 취임    2010 년 01 월 05 일 등기

감사 조영섭 650702-1\*\*\*\*\*\*
    2010 년 01 월 01 일 취임    2010 년 01 월 05 일 등기

대표이사 김창중 520623-1\*\*\*\*\*\* 서울특별시 강남구 대치동 511 한보미도맨션 207-906
    2010 년 01 월 04 일 취임    2010 년 01 월 05 일 등기

---

## 기 타 사 항

1. 명의개서대리인
   명의개서대리인의 상호 및 본점소재지
   주식회사 국민은행
   서울특별시 중구 남대문로2가 9-1
   2009 년 01 월 16 일 설치    2009 년 01 월 19 일 등기

1. 이익에 의한 주식 소각
  1) 회사는 이사회의 결의로 발행주식총수의 100분의 20 범위 내에서 주주에게 배당할 이익으
    로 주식을 소각할 수 있다.
  2) 이 규정에 의한 주식의 소각은 회사가 자기주식을 취득하여 소각하는 방법으로 한다.
    2009 년 01 월 16 일 신설    2009 년 01 월 19 일 등기

1. 흡수합병
   서울특별시 종로구 당주동 128-27 대보해운 주식회사를 합병
                      2010 년 01 월 05 일 등기

---

## 신 주 인 수 권 부 사 채

대보해운 주식회사 제 1 회 무기명식 이권부 사모 무보증 분리형 신주인수권부사채
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료    2010 년 12 월 01 일 등기 >
1. 본사채는 신주인수권부사채임.
1. 주식인수권의 행사로 인하여 발행할 주식의 발행가액 총액

---

발급확인번호 0535-AAMY-XYSV

O000525043157014880321110120610109DABFEBC1F819670917 1 발행일:2012/08/17

- 2/6 -



| 등기번호 | 384053 |
|---|---|

금 40억 (금4,000,000,000)원
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >
1. 각 신주인수권부사채의 금액
10억원권 2매(넘버 1-2), 5천만원권 39매(넘버 3-41), 1천만원권 5매(넘버 42-46)
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >
1. 각 신주인수권부사채의 납입금액
각 사채권면금액의 100퍼센트
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >
1. 신주인수권부사채의 총액
금 0원
   < 2010 년 01 월 05 일 합병으로인한승계   2010 년 01 월 05 일 등기 >
   < 2010 년 11 월 30 일 기간만료   2010 년 12 월 01 일 등기 >
1. 각 신주인수권부사채에 부여된 신주인수권의 내용
사채의 종류 : 무기명식 이권부 사모 무보증 분리형 신주인수권부사채
본 사채의 신주인수권증권을 소지한 자는 다음 각 호의 조건에 따라 당사의 기명식 보통주식을
인수할 수 있다.
(1) 신주인수권행사조건
가. 신주인수권행사비율 : 신주인수권증권 권면금액(2이상의 신주인수권증권으로 신주인수권을
행사하는 경우에는 그 권면금액의 합산금액)을 아래 나.항의 신주인수권 행사가액으로 나눈 주
식수의 100%를 행사주식수로 하고, 1주 미만의 단수주에 해당하는 금액은 주권 교부시 당사 또
는 당사가 지정하는 금융기관에서 현금으로 지급하며, 단수주 대금의 해당기간 이자는 지급하지
아니한다. 단, 신주인수권증권 권면금액의 일부에 대한 신주인수권행사는 할 수 없다.
나. 신주인수권 행사가액("행사가액") : 87,039원
다. 행사가액 조정 :
1) 신주인수권행사를 하기 전에 당사가 주식분할, 당초의 행사가액을 하회하는 발행가액으로 전
환사채 또는 신주인수권부사채를 발행하거나, 유상증자(유상증자의 1주당 발행가액이 조정 전
행사가액을 하회하는 경우에 한한다) 또는 무상증자, 주식배당, 준비금의 자본전입 등을 함으로
써 주식을 발행하는 경우에는 다음과 같이 행사가액을 조정한다. 단, 유,무상증자를 병행 실시
하는 경우, 유상증자의 1주당 발행가액이 조정 전 행사가액을 상회하는 때에는 유상증자에 의한
신발행주식수는 행사가액 조정에 적용하지 아니하고 무상증자에 의한 신발행주식수만 적용한다
.

조정 후 행사가액 = 조정 전 행사가액 X (A +(B X C/D)) / (A + B)
A : 기발행주식수
B : 신발행주식수
C : 1주당 발행가액
D : 시가
다만, 위 산식 중 "기발행주식수"는 당해 조정사유가 발생하기 직전일 현재의 발행주식 총수로
하며, 전환사채 또는 신주인수권부사채를 발행할 경우 "신발행주식수"는 당해 사채 발행시 전
환가액으로 전부 주식으로 전환되거나 당해 사채 발행시 행사가액으로 신주인수권이 전부 행사



OOO00525043157014880321110120610 1B9DABFEBC1F819670917 1 발행일:2012/08/17



| 등기번호 | 384053 |
|---|---|

될 경우 발행될 주식의 수로 한다. 또한, 위 산식 중 "1주당 발행가액"은 주식분할, 무상증자, 주식배당의 경우에는 영(0)으로 하고, 전환사채 또는 신주인수권부사채를 발행할 경우에는 당해 사채발행시 전환가액 또는 행사가액으로 하며, 위 산식에서 "시가"라 함은 상장법인의 경우 당해 발행가액 산정의 기준이 되는 기준주가 또는 이론권리락 주가(유상증자 이외의 경우에는 조정사유 발생전일을 기산일로 계산한 기준주가)로 하고, 비상장법인의 경우 당해 조정사유 발생일 직전의 본 사채의 행사가액을 시가로 하되 다만 공모에 의하여 주식을 발행한 경우에는 그 공모가액을 시가로 한다. 위의 산식에 의한 조정 후 행사가액의 원단위 미만은 절사한다.
2) 합병 및 자본의 감소 등에 의하여 행사가액의 조정이 필요한 경우에는 당해 합병 또는 자본의 감소 직전에 신주인수권이 행사되어 전액 주식으로 인수되었더라면 신주인수권 권리자가 가질 수 있었던 주식수를 그 가치 또는 그 이상으로 계산되는 방법으로 행사가액을 조정한다.
3) 위 제1)항 또는 제2)항에 따른 행사가액 조정 이외에도 당사가 본 사채 발행 후 그 주권을 증권선물거래소에 상장한 때에는 그 공모가격의 100%에 해당하는 가격과 직전 행사가액 중 낮은 가격으로 행사가액을 조정하며 그 상장일(이하 "상장일")이 전까지 상장일로부터 매 3개월마다 행사가액을 조정하되, 행사가 조정일을 기준일로 하여 소급한 최근 1개월, 1주일, 최근일을 산술평균한 가격과 최근일 종가 중 높은 가액이 기존의 행사가 격을 하회할 경우 행사가격을 그 높은 가액으로 조정하기로 한다. 다만 이에 따라 산출된 가격이 직전 행사가액보다 높은 경우에는 직전 행사가액을 조정된 행사가액으로 보며, 본 호에 의한 행사가액의 조정은 상장일에 조정된 행사가액의 100분의 70미만으로 될 수는 없다.
4) 위 1) 내지 3)에 의하여 조정된 행사가액이 주식의 액면가 이하일 경우에는 액면가를 행사가액으로 하며, 상장일 이후에는 각 신주인수권부사채에 부여된 신주인수권의 행사로 인하여 발행할 주식의 발행가액의 합계액은 각 신주인수권부사채의 발행가액을 초과할 수 없다.
(2) 신주인수권행사로 인하여 발행할 주식의 종류 : 가명식 보통주식
(3) 신주인수권대금의 납입 : 현금 납입 또는 상계 납입 중 선택가능
9. 사채권 및 신주인수권증권의 분할 금자 : 발행일로부터 1년간 그 분할은 인정되지 아니한다

< 2010 년  01 월  05 일  합병으로인한승계   2010 년 01 월 05 일 등기 >
< 2010 년  11 월  30 일  기간만료   2010 년 12 월 01 일 등기 >
1. 신주인수권을 행사할 수 있는 기간
발행일(2005년 12월 14일)이후 1개월이 경과한 날의 익일(2006년 1월 15일)로부터 2010년 11월 30일 까지로 한다.
< 2010 년  01 월  05 일  합병으로인한승계   2010 년 01 월 05 일 등기 >
< 2010 년  11 월  30 일  기간만료   2010 년 12 월 01 일 등기 >

## 주 식 매 수 선 택 권
1. 일정한 경우 주식매수선택권을 부여할 수 있다는 뜻
회사는 주주총회의 특별결의로 발행주식 총수의 100분의 10 범위 내에서 주식매수선택권을 부여할 수 있으며, 증권거래법 제189조의4 제3항의 규정에 따라 발행주식총수의 100분의 10 범위 내에서 이사회의 결의로 주식매수선택권을 부여할 수 있다. 이 경우 주식매수선택권은 경영성과 또는 주가지수 등에 연동하는 성과연동형으로 부여할 수 있다. 다만, 벤처기업육성에 관한 특별조치법 제16조의3 규정에 의한 기술 및 경영능력을 갖춘 자로서 대통령령이 정하는 자 및 대학 또는 대통령령이 정하는 연구기관에게도 주식매수선택권을 주주총회의 특별결의에 의하여 부여할 수 있다. 단, 이사회 결의로 주식매수선택권을 부여한 경우 그 부여한 이후

O00005250431570148803211101206101B9DABFEBC1F819670917 1 발행일:2012/08/17



| 등기번호 | 384053 |
|---|---|

소집되는 주주총회의 승인을 얻어야 한다.
1. 주식매수선택권의 행사로 발행하거나 양도할 주식의 종류와 수
  1) 주식매수선택권의 행사로 기명식보통주식(또는 기명식우선주식)을 발행하거나, 기명식보통주식(또는 기명식우선주식)인 자기주식을 교부하며 또는 주식매수선택권의 행사가격과 시가와의 차액을 현금 또는 자기주식으로 교부할 수 있다.
  2) 주식매수선택권을 행사할 주식의 1주당 행사가격은 다음 각 호의 가격이상이어야 한다. 주식매수선택권을 부여한 후 그 행사가격을 조정하는 경우에도 또한 같다.
    1. 새로이 주식을 발행하여 교부하는 경우에는 다음 각목의 가격 중 높은 금액
  가. 주식매수선택권의 부여일을 기준으로 증권거래법 시행령 제84조의9 제2항 제1호의 규정을 준용하여 평가한 당해 주식의 시가
  나. 당해 주식의 권면액
    2. 위 1호 이외의 경우에는 제1호 가 목의 규정에 의하여 평가한 당해 주식의 시가
1. 주식매수선택권을 부여받을 자의 자격요건
  1) 주식매수선택권의 부여대상자는 회사의 설립, 경영, 해외영업 또는 기술혁신 등에 기여하거나 기여할 수 있는 회사의 임직원 및 증권거래법 시행령 제84조의6 제1항이 정하는 관계회사의 임직원으로 한다. 다만, 회사의 이사에 대하여는 이사회의 결의로 주식매수선택권을 부여할 수 없다.
  2) 위 1)의 규정에도 불구하고 증권거래법상의 최대주주 및 주요주주 및 그 특수관계인에게는 주식매수선택권을 부여할 수 없다. 다만, 당해 법인 및 증권거래법 시행령 제84조의6 제1항이 정하는 관계회사의 임원이 됨으로써 특수관계인에 해당하게 된 자(그 임원이 계열회사의 비상근임원인 자를 포함한다)에게는 주식매수선택권을 부여할 수 있다.
  3) 임원 또는 직원 1인에 대하여 부여하는 주식매수선택권은 발행주식 총수의 100분의 10을 초과할 수 없다.
1. 주식매수선택권의 행사기간
  1) 주식매수선택권은 이를 부여하는 주주총회 결의일로부터 2년이 경과한 날로부터 3년 이내에 행사할 수 있다.
  2) 주식매수선택권을 부여 받은 자는 이를 부여하는 결의일로부터 2년 이상 재임 또는 재직하여야 행사할 수 있다. 다만 주식매수선택권을 부여 받은 자가 그 결의일로부터 2년 내에 사망하거나 정년으로 인한 퇴임 또는 퇴직 기타 본인의 귀책사유가 아닌 경우 주식매수선택권을 행사할 수 있다.
1. 일정한 경우 이사회결의로 주식매수선택권의 부여를 취소할 수 있다는 뜻
  다음 각 호에 해당하는 경우에는 이사회의 결의로 주식매수선택권의 부여를 취소할 수 있다.
  1. 당해 임,직원이 주식매수선택권을 부여 받은 후 임의로 퇴임하거나 퇴직한 경우
  2. 당해 임,직원이 고의 또는 과실로 회사에 중대한 손해를 초래하게 한 경우
  3. 회사의 파산 또는 해산 등으로 주식매수선택권의 행사에 응할 수 없는 경우
  4. 기타 주식매수선택권 부여계약에서 정한 취소사유가 발생한 경우
  2009 년  01 월  16 일  설정     2009 년  01 월  19 일  등기

| 회사성립연월일 | 2008 년  02 월  14 일 |
|---|---|

등기기록의 개설 사유 및 연월일
  설립
                                        2008 년  02 월  14 일  등기

---






이 증명서는 등기기록의 내용과 틀림없음을 증명합니다. [다만, 신청이 없는 지점ㆍ지배인에
관한 사항의 기재를 생략하였습니다]

서기 2012년 08월 17일

법원행정처 등기정보중앙관리소              전산운영책임관

* 실선으로 그어진 부분은 말소(변경,경정)된 등기사항입니다. * 등기사항증명서는 컬러로 출력 가능함.

[인터넷 발급] 문서 하단의 바코드를 스캐너로 확인하거나, 인터넷등기소(http://www.iros.go.kr)의
발급확인 메뉴에서 발급확인번호를 입력하여 위ㆍ변조 여부를 확인할 수 있습니다.
발급확인번호를 통한 확인은 발행일부터 3개월까지 5회에 한하여 가능합니다.

발급확인번호 0535-AAMY-XYSV

0000525043157014880321110120610 1B9DABFEBC1F819670917 1 발행일:2012/08/17

- 6/6 -

[제45호서식]          공증 **법무법인  대  종**          서울 종로구 당주동 160
                      인가                                   (변호사회관 303호)
                                                           [공증부 736-6604]

위 번역문은 원문과 상위없음을          I swear that the attached translation
서약합니다.                          is true to the original.

    2012.  8.  17.                    Aug. 17.  2012.

서약인   송 헌      ㉑          Signature

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

등부  2012 년   제 3809 호          Registered No.    2012 - 3809
       **인    증**                 Notarial Certificate

위 송헌 은                          Song Heon
                                            personally
본 공증인의 면전에서 위 번역문이      appeared before me, confirmed
원문과 상위없음을 확인하고 서명      that the attached translation is
날인 하였다.                        true to the original and subscribed
                                   his (her) name.

2012 년 8 월 17 일 이 사무소에서      This is hereby attested on this
위 인증한다.                        17th day of  Aug, 2012
                                   at this office.


공증 **법무법인   대  종**          DAE JONG LEGAL CORPORATION
인가
소속 서울중앙지방검찰청            Seoul Central District Prosecutors'
                                   Office
주소 : 서울특별시 종로구 당주동 160   160, Dang Joo-Dong, Jong Ro-Ku,
                                   Seoul, Korea

                                   Lawyer in charge

공증담당변호사                      JUNG BONG HYUN
                                   This office has been authorized
                                   by the Minster of Justice, the
                                   Republic of Korea, to act as
                                   Notary Public Since
                                   February   21st.   1986
                                   under Lawyers Act Article 31.

                                   210mm×297mm(보존용지(1종) 70g/m²)

## PLAN AND AGREEMENT OF MERGER

Subject to the terms and conditions of this Agreement, the Daebo International Shipping Co., Ltd. (herein sometimes referred to as the "Surviving Company") shall merge with the Daebo Shipping Co., Ltd. (the "DSC").

Article I

The Daebo International Shipping Co., Ltd. shall be the Surviving Company in the merger and shall continue its existence as a corporation.   The separate corporate existence of the DSC shall cease.

Article II

① By the merger, the total number of shares issued of the Surviving Company shall be increased by 183,824 shares to 383,824 shares.   However, the number may change subject to negotiations between the Surviving Company and the DSC.

② All shares issued by the Surviving Company in the preceding clause shall be common stock in registered nominative form, denomination KRW 5,000.

Article III

① As of the merger, the Surviving Company shall issue 183,824 shares of common stock in registered nominative form.   For shareholders of record on the effective date of the merger, each share of the DSC shall be converted into the right to receive 0.183824 of a share of common stock of the Surviving Company.   However, the exchange ratio may change subject to negotiations between the Surviving Company and the DSC.   For fractional shares, the Surviving Company will pay a cash amount calculated in accordance with the merger rate.

Article IV

By the merger, the capital of the Surviving Company shall be increased by KRW 919,120,000. As for the reserved, the amount may change subject to negotiations between the Surviving Company and the DSC, depending on the financial status of the DSC as of the merger date.

## Article V

On November 27, 2009, the Surviving Company and the DSC shall each hold a general shareholders' meeting to approve this merger agreement and precede necessary procedures relevant to the merger.   Under certain circumstances, the date may change subject to negotiations between the Surviving Company and the DSC.

## Article VI

The date of the merger is December 31, 2009, whereby under certain circumstances, the date may change subject to negotiations between the Surviving Company and the DSC.

## Article VII

① On the date of the merger, the DSC shall transfer all of its assets, liabilities, and rights and duties to the Surviving Company, based on the DSC's financial status as of December 31, 2009.

② In the case of changes in the DSC's financial status, occurred from the date in the preceding clause to the date of the merger, the DSC shall attach separate statements to inform and obtain approval from the Surviving Company for the changes.

## Article VIII

From the signed date of this Agreement until the date of the merger, the Surviving Company and the DSC shall act in good faith in carrying out their duties and managing the property.   Actions that have substantial impact on the property and duties shall be executed only after the Surviving Company and the DSC negotiate and reach an agreement.

## Article IX

Dividends of stock set forth in Article III shall be paid out on the date of the merger.

## Article X

The Surviving Company shall take over all employees of the DSC at the date of the merger. However, years of service shall be calculated according to the regulation of the DSC, and any

other details shall be negotiated.    Employment regulations and working conditions of the DSC shall also be modified under the agreement with the Surviving Company.

Article XI

The newly hired executives of the Surviving Company, as a result of the merger, shall be appointed at the general shareholders' meeting of the Surviving Company set forth in Article V. However, the appointment of executives pursuant to this Article shall be made on the date of the merger.

Article XII

With the approval at the merger announcement meeting, the Surviving Company shall pay retirement bonus to retiring executives of the DSC.

Article XIII

In the case of natural disaster or other unforeseen events, occurring from the signed date of this Agreement until the date of the merger, that result in substantial changes to property and financial status of the Surviving Company or the DSC, or in the case of substantial flaws, amendment or termination shall be effective under the agreement between the Surviving Company and the DSC.

Article XIV

This agreement shall be effective upon the approval of shareholders of general meetings stated in Article V, and shall be invalidated without the approval of government offices and agencies concerned with law.

Article XV

The DSC shall pay all expenses incurred in connection with the DSC's dissolution.

Article XVI

Any other necessary details (relevant to the merger) not included in this Agreement shall be

agreed upon negotiations between the Surviving Company and the DSC.

Two notarized copies of the Agreement (each signed and sealed by the two CEOs) are provided, whereby the Surviving Company and the DSC each keeps a copy.

October 26, 2009

(a) Jongno-gu Dangju-dong, Seoul, 128-27

Daebo International Shipping Co.,LTD.

CEO    J.Y.NHO

(b) Jongno-gu Dangju-dong, Seoul, 128-27

Daebo Shipping Co., Ltd.

CEO   C.J.KIM

## 합 병 계 약 서

대보인터내셔널쉬핑 주식회사(이하 "갑"이라 한다)는 대보해운 주식회사(이하 "을"이라 한다)를 합병하기 위하여 다음과 같이 계약을 체결한다.

제 1조  "갑"은 "을"을 합병하여 "갑"은 존속하고, "을"은 해산한다.

제 2조  ① "갑"은 합병에 의하여 그 발행하는 주식의 총수를 183,824주 증가하여 383,824주로 한다. 다만, "갑"과 "을"의 협의 하에 변경할 수 있다.
②  전항의 증가하는 주식은 전부 기명식 액면보통주식으로 하고, 1주당 액면금액을 5,000원으로 한다.

제 3조  "갑"은 합병시 기명식 액면보통주 183,824주를 발행하고, 합병기일 현재 "을"의 주주명부에 기재된 주주에 대하여 그가 소유하는 "을"의 주식 1주당 "갑"의 주식 0.183824주의 비율로 교부한다. 다만, "갑"과 "을"의 협의 하에 변경할 수 있다. 또한, 단주가 발생하는 때에는 합병기일 후 합병비율 산정시 평가한 금액을 현금으로 해당주주에게 지급한다.

제 4조  "갑"은 합병으로 자본금 919,120,000원을 증가한다. 그러나 준비금에 관하여는 합병기일에 있어서의 "을"의 자본상태에 따라 "갑", "을"의 협의 하에 이를 변경할 수 있다.

제 5조  "갑"과 "을"은 2009년 11월 27일 각각 주주총회를 소집하여 본 계약서의 승인 및 합병에 따른 필요한 사항에 대한 제반절차를 수행한다. 다만, 합병절차의 진행에 따라 필요한 때에는 "갑", "을"의 협의에 의하여 기일을 변경할 수 있다.

제 6조  합병기일은 2009년 12월 31일로 한다. 다만, 합병절차의 진행에 따라 필요한 경우에는 "갑", "을"의 협의하에 이를 변경할 수 있다.

- 1 -

제 7조 ① "을"은 2009년 12월 31일 현재의 재산목록, 대차대조표 기타 동일 현재의 계산서를 기초로 하여 그 자산, 부채 및 권리의무 일체를 합병기일에 "갑"에게 인계한다.

② "을"은 전항 기일부터 합병기일에 이르기까지 자산, 부채의 변동에 대하여 따로 계산서를 첨부하여 그 내용을 "갑"에게 제시하여 확인을 받아야 한다.

제 8조 "갑"과 "을"은 본 계약 체결 후 합병기일에 이르기까지 선량한 관리자의 주의의무로 업무를 집행하고 모든 재산을 관리운영을 하여야 하며, 또 그 재산 및 관리의무에 중대한 영향을 주는 행위를 하는 경우에는 사전에 "갑"과 "을"이 협의하여 합의한 내용을 실행하여야 한다.

제 9조 "갑"은 전3조에서 발행하는 주식에 대하여 이익배당금의 기산일로서 합병기일을 기준일로 한다.

제10조 "갑"은 "을"의 종업원 전원을 합병기일에 있어서 갑의 종업원으로서 인수한다. 다만, 근속연수는 "을"의 계산방식에 따른 연수를 통산하기로 하고 기타 자세한 내용에 대하여는 "갑", "을"의 협의 하에 정하기로 한다. 또한 을의 근로조건과 취업규칙 등은 갑과 같이 변경하기로 한다.

제11조 합병에 의하여 새로 "갑"의 임원으로 되는 임원은 제5조에 의한 갑의 합병승인총회에서 선임키로 한다. 다만, 본 조에 의하여 선임되는 임원의 임기의 시기는 합병기일로 한다.

제12조 "갑"은 "을"의 임원 중 합병 후 "갑"의 임원으로 취임하지 않는 임원에 대하여는 퇴직위로금을 합병보고총회의 승인을 얻어 지급할 수 있다.

제13조 본 계약 체결 후 합병기일까지 사이에 천재지변 기타사유로 인하여 "갑" 또는 "을"의 재산 및 경영상태에 중대한 변동이 발생하거나 숨은 중대한 하자가 발견되었을 때에는 "갑"과 "을"이 협의하여 합병조건을 변경하거나 본

- 2 -

계약을 해약할 수 있다.

제14조 본 계약은 제5조에 규정하는 "갑"과 "을"의 주주총회의 승인을 얻은 때 그 효력이 발생하고 법령에 정하는 관계관청의 승인을 얻지 못한 때에는 그 효력을 상실한다.

제15조 "을"의 해산에 관한 비용은 전부 "을"이 부담한다.

제16조 본 계약에 규정된 내용 이외의 합병에 관한 필요사항은 본 계약의 취지에 따라 "갑"과 "을"이 협의하여 이를 결정하기로 한다.

본 계약의 성립을 증하기 위하여 본 계약서 2통을 작성하여 "갑"과 "을"의 대표자가 각자 기명날인하여 각 1통씩 보관한다.

 

2009년 10월 26일

(갑) 서울특별시 종로구 당주동 128-27
대보인터내셔널쉬핑 주식회사
대 표 이 사   노 재 영

(을) 서울특별시 종로구 당주동 128-27
대 보 해 운   주 식 회 사
대 표 이 사   김 창 중

- 3 -

# EXHIBIT 2

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

DAEBO SHIPPING CO. LIMITED

Claimants
(Owners)

and

AMERICAS BULK TRANSPORT LIMITED

Respondents
(Charterers)

**"NICOLE" C/P dd 15.1.08**

**FINAL AWARD**

**WHEREAS:**

(A)   By a charter on the BHPTime form, with amendments, dated 15
January 2008, the claimants ("the owners") chartered to the
respondents ("the charterers") the ship "Nicole" of which the
claimants were time-chartered owners for a period on terms and
conditions more particularly set out therein.

(B)   Clause 42(b) of the charter provided for any dispute arising
thereunder to be referred to arbitration in London in a manner
more particularly set out therein, and for English law to apply.

(C)   Disputes did arise for the determination of which the owners appointed me, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London WC1V 6DR, and the charterers appointed me, the undersigned Timothy Rayment of 47 Castelnau, London SW13 9RT as arbitrators respectively.   We both accepted appointment on the basis of the LMAA Terms 2006 which accordingly applied to this reference.   The seat of the arbitration is London, England.

(D)   The disputes referred to us concerned the owners' claim for a balance of unpaid hire $306,234.80, liability for which the charterers denied, and the charterers' counterclaim for a balance allegedly due to them of $729,819.55, liability for which the owners denied.

(E)   The parties' lawyers provided us with written submissions and copies of the documents upon which they relied.   Neither party requested an oral hearing.

**NOW WE,** the said Bruce Harris and Timothy Rayment, having taken upon ourselves the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before us and given due weight thereto, and having discussed the matter with one another and found ourselves in agreement, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL AWARD,** as follows:

1.   **WE FIND AND HOLD** that the owners' claims succeed in full and that the charterers' counterclaim fails and is hereby dismissed.

2

2.    **WE THEREFORE AWARD AND ADJUDGE** that the charterers shall forthwith pay to the owners the sum of $306,234.80 (Three hundred and six thousand, two hundred and thirty-four United States dollars and eighty cents) together with interest thereon at the rate of 4.50% per annum compounded at three-monthly rests from 1 August 2008 until the date of payment hereunder.

3.    **WE FURTHER AWARD AND ADJUDGE** that the charterers shall bear and pay their own and the owners' costs of this reference, the owners' said costs to be assessed by us (if not agreed) on the standard basis (for which purpose we reserve jurisdiction to make a further Award or Awards as necessary), **AND** that the charterers shall bear and pay the costs of this our Award which we hereby fix in the sum of £12,155 (Twelve thousand one hundred and fifty-five Pounds Sterling)] **PROVIDED** that if, in the first instance, the owners shall have paid any amount in respect of the costs hereof, they shall be entitled to an immediate refund from the charterers of the sum so paid.

4.    **WE FURTHER AWARD AND DIRECT** that the charterers shall pay to the owners interest upon the sums referred to paragraph 3 above at the rate of 4.50% per annum compounded at three-monthly rests, from the date hereof in respect of the owners' costs and from the date of any payment by the owners to us in

3

respect of the costs of this Award, down to the date of reimbursement by the charterers in both cases.

**GIVEN** under our hands this 13th day of March 2012.

..............................................       ..........................................
Bruce Harris                                          Witness

..............................................       ..........................................
Timothy Rayment                                       Witness

4

### "NICOLE" – C/P dd. 15.1.08

### REASONS
for, and forming part of

### FINAL AWARD

1.  Because the claimants in this case, Daebo Shipping Limited, were
    time-chartered owners of the ship "Nicole" and because the head
    owners, Pacific Leader Shipping Limited, although not a party to this
    arbitration, play a part in the narrative, we shall refer to the
    claimants as "Daebo" and to the respondent charterers, Americas
    Bulk Transport Limited, as ABT, while we shall refer to the head
    owners as such.

2.  "Nicole" is a 77,096 dwt gearless bulk carrier owned by the head
    owners and chartered by them to Daebo in February 2007 for a
    period 12-14 months.  The ship having been delivered to Daebo on
    28 March 2007, the latest date for redelivery by them to head
    owners was 27 May 2008.

3.  In January 2008 Daebo sub-chartered Nicole to ABT on back-to-
    back terms by a charter dated 15 January 2008.  That provided that
    the ship was to be redelivered "minimum 14 April 2008 to maximum
    27 May 2008".

4.  The major dispute between the parties arose because Daebo (and
    the head owners) took the position that a voyage which ABT wished
    to perform could not be completed before 27 May 2008.  They also
    took the position that the cargo ABT wished to load was not
    permitted under the charter.  As a result ABT gave alternative

orders but again Daebo and the owners considered that these could not be complied with before the agreed redelivery date. In due course an agreement was reached postponing the last date for redelivery in exchange for an increase in the rate of hire payable by ABT.

5.    Daebo claim unpaid hire of $306,234.80 whereas ABT say that nothing is due to Daebo, and rather that a balance of $729,819.85 and/or damages is due to them. This is on the basis that ABT say the refusal to perform the final voyage(s) was a breach by Daebo, and/or that the agreement to extend the redelivery date was voidable because it had been entered into under economic duress. There are also three minor disputes to which we turn towards the end of these Reasons.

**The Carboex fixture – the first refusal**

6.    On 15 April 2008, ABT sent a message to the master advising him that the ship had been fixed for her next employment to load a cargo of coal at the St James anchorage (Mississippi) for discharge in Spain, and asked for displacement calculations on the basis of loading the maximum possible cargo. The master, in response, provided the displacement calculations requested and did not raise any objections to or questions on the message from ABT. ABT contended that this message amounted to voyage instructions, with which the master failed to comply.

7.    Daebo, however, contended that ABT had not provided voyage instructions to the master, and therefore whether or not their views that the voyage could not be completed in time and that the cargo was illegitimate were correct, there could be no breach of charter. However, Daebo did not put forward this argument with any great degree of conviction, not surprisingly in our view. There is no specific form required for voyage instructions or orders. Whilst the

2

message of 15 April was less specific than instructions given in respect of an earlier voyage, we are not prepared to hold that for the purposes relevant here, it did not amount to instructions that were sufficient, if they were not complied with, to give rise to a breach on the part of Daebo unless there were other circumstances excusing them from compliance.

8.    Daebo are, in our view, on much more solid territory in relation to their other relevant contentions, namely that the ship was not obliged to load the Carboex cargo because of its nature, and that in any event the voyage could not be completed before the redelivery date, and therefore they were entitled to refused to perform.

*The nature of the Carboex cargo*

9.    We first consider the nature of the cargo.  In the head charter between head owners and Daebo there was an express provision to the effect that the ship would not be required to carry bituminous coal.  During the fixture negotiations for the charter with which we are concerned it was made clear that the fixture was to be on the basis that it would be "back-to-back" with the head charter. Indeed, the fixture recap of 15 January 2008, which was subsequently transcribed into the charter itself, provided for a specific exclusion of bituminous coal.   Notwithstanding this, however, ABT argued that this did not "in practice mean that the vessel did not in fact carry steam coal/bituminous coal under the head charter".  They went on to say that during the negotiations for this fixture, oral representations were made by the owners' brokers to the effect that steam/bituminous coal was a permissible cargo.

10.   This latter case is, however, simply unacceptable. In the first place, ABT gave no particulars whatsoever as to who was alleged to have made such representations, nor when, where or how.  Secondly, there was absolutely no evidence to support the case.  Thirdly,

Daebo's own evidence directly contradicted any suggestion that there was any such oral representation. Fourthly, there was no suggestion from ABT that any oral representation of the kind had been made until they served their reply submissions in the arbitration. If there had been anything in the point, ABT would undoubtedly have raised it much earlier. This is plainly an argument without any foundation whatsoever and we accordingly reject it.

*Estoppel*

11.   ABT went on, however, to argue that Daebo were somehow estopped from relying on the express term excluding bituminous coal from carriage under the charter. They purported to reply on a promissory estoppel, or an estoppel by representation. The alleged representations upon which they relied were, firstly, the alleged oral representations with which we have just dealt, secondly a statement contained in a questionnaire to the effect that the ship had previously loaded 5 cargoes of coal in bulk, and thirdly the loading and carriage of an earlier cargo known as "the Davant cargo".

*The questionnaire*

12.   We do not need to say anything more about the alleged oral representation. We turn immediately to deal with the questionnaire. When the fixture was concluded the charterers sent a detailed questionnaire to the master. Amongst other questions he was asked to identify the 5 previous cargos carried, and did so by referring to each of them as "coal in bulk". In relation to the immediately previous cargo, he stated that it was "steam coal in bulk". Because he referred to that cargo in the list of the 5 previous cargoes as being "coal in bulk", ABT said this would suggest to the recipient of the questionnaire that all of the previous 5 cargoes were in fact "steam coal". That argument seems to us to stretch beyond

4

the normal limits the likely suggestibility of a reasonable recipient of the questionnaire, but in the event this point does not matter. Some steam coal cargos are bituminous coal, but not all. ABT sought to make something of a passage in Daebo's expert's report to the effect that it would be reasonable for a master to conclude that a cargo described as steam coal "might" be bituminous, but they failed to give sufficient weight to the word "might" in seeking to place this reliance.

13. In any event, even assuming that what the master said in the questionnaire could fairly be taken as a representation that bituminous coal cargoes had been carried in the past (contrary to our view as just expressed) there was nothing to suggest an unequivocal promise to the effect that bituminous coal could or would be carried in future. And considering that in the charter – which had only just been agreed when the questionnaire was completed - the parties had expressly agreed to exclude bituminous coal, the position would have had to have been made extremely clear indeed in the questionnaire for any such promise to arise. And, as Daebo argued, the questionnaire said and was intended to say nothing about what cargoes would be *permitted* under the charter, but was only a statement as to what cargoes had previously been carried.

14. Moreover, the cargoes in question were carried under the head charter, not the present one, so whether or not the head owners had permitted Daebo to load prohibited cargoes previously could have no relevance to the question whether Daebo would enforce their strict rights against ABT. Daebo might have had some express agreement with the head owners to carry the cargoes in question, even if they, or any of them consisted of bituminous coal, so nothing could be inferred from the questionnaire about the legal position operating between head owners and Daebo.

5

15.    Lastly, even if, contrary to all these considerations, there was an unequivocal representation in the questionnaire that Daebo would permit bituminous coal, ABT could not show that this was a representation upon which they were intended to rely, given that the parties had only just expressly agreed that bituminous coal was not to be permitted.

*The Davant cargo*

16.    It follows that ABT's reliance on the questionnaire is wholly misplaced. We accordingly turn to consider the Davant cargo. Between 4 and 9 March 2008 the ship loaded, pursuant to ABT's orders, a cargo at Davant which was described as "steam coal". Again, as Daebo's expert made clear, whilst such a cargo might have been bituminous coal, it might have been non-bituminous. Daebo could not reasonably have known what it was on the basis of the information they had. They were entitled to assume that ABT would not deliberately breach the charter terms. In these circumstances, there can have been no unequivocal representation to the effect that Daebo would allow bituminous coal to be loaded.

17.    Further, even if, contrary to our view, the loading of the Davant cargo could be regarded as an unequivocal representation by Daebo that bituminous coal could be loaded on that voyage, it could not possibly be regarded as a promise to accept such coal in future. And once more, ABT could not show that any representation (though we do not think there was one) could have been intended to be relied upon by them to alter the legal relationship between the parties.

18.    It follows that ABT failed wholly to show any relevant representation, or any intention to rely upon any such representation. For these reasons alone, their case on estoppel by representation or promissory estoppel must fail, and therefore

6

Daebo were entitled to refuse to load the Carboex cargo, regardless of the issue as to the redelivery date.

*Estoppel by convention*

19.   In their closing submissions (but not earlier in the arbitration) ABT sought to rely upon an estoppel by convention. This was not, by any means, the first point that they raised late in the day, and that fact alone may be thought to reflect upon the merits of the point, but despite the protest by Daebo we deal with this issue briefly, not least because once again it does not help ABT.

20.   What ABT relied upon in this respect was an argument that "it was permissible ... to order the vessel to load cargos of steam coal/bituminous coal notwithstanding the express terms of the charterparty". That, as Daebo argued, was an assumption as to future conduct rather than an assumption of present fact or law, as is required for an estoppel by convention. For this reason alone, the point had no merit. In addition, however, as Daebo argued, ABT would have had to show a clear and unequivocal statement (or conduct) demonstrating that the relevant assumption was communicated "across the line" between the parties: as has already been shown in respect of the earlier estoppel arguments, ABT could not indicate any statement or conduct on Daebo's part establishing unequivocally that they would permit the loading of bituminous coal.

21.   Lastly, it would have to be unjust or unconscionable for a party to deny the alleged convention, but given the clear terms of the charter, that could not be shown since it could not be reasonable for ABT to rely upon any assumption that they might – contrary to our conclusions – have been able to establish. Once again, therefore, ABT's case is wholly without merit.

**The duration of the Carboex voyage**

7

22.  In these circumstances we turn to consider – although it is not strictly necessary to do so – whether Daebo were entitled to refuse to perform the Carboex voyage on the basis that the ship could not reasonably be estimated to redeliver before the latest permitted redelivery date.

23.  Daebo relied upon a calculation performed by their expert which showed that, in his view, the Carboex voyage would have been likely to complete on 30 May 2008, i.e. 3 days after the last date for redelivery. That calculation was in line with conclusions reached by the ship's operators in April 2008 who went through a very careful calculation based on various assumptions which were, so far as possible, supported by the results of the enquiries made with local agents as to possible delays etc.

24.  ABT reckoned that as at 16 April 2008 the voyage could have been completed by 21 May, and that as at 5 May when she had completed discharging at Mobile after some delays, the Carboex voyage could still have been completed by 25 May. However, they did not adduce any factual evidence to support their calculations. They did criticise the position of Daebo and their expert and said that in the final analysis, having regard to the criticisms advanced, even their position would be that the voyage would have completed only one day after the latest date, which was to be compared with ABT's calculation that she would have completed three days before that date.  They said the burden was on Daebo to show why they refused to comply with the orders given, and that in the absence of compelling evidence as to why they were correct, any doubt should be resolved in ABT's favour.

25.  We beg leave to doubt that final proposition and consider that it is in fact for ABT to show that the voyage could have been performed in time.  Whether or not that is correct is, ultimately, of no importance since we conclude that the owners and Daebo's calculations, as well

as those of Daebo's experts, were entirely reasonable.  We do not need to go into ABT's criticisms of Daebo's expert's calculations: they seem to us baseless for reasons given by Daebo, but at the end of the day those criticisms only went to support a proposition that the expert's estimate was 2.5 days too long and, as Daebo pointed out, that was still insufficient to show that any instructions given to perform the Carboex voyage were lawful.

26.    Because we are satisfied that the orders to perform that voyage were unlawful as bituminous coal was and remained an excluded cargo, and because we are satisfied that in any event the voyage could not have been performed by the latest date for redelivery, there was no breach by Daebo in refusing to perform it, and consequently, no counterclaim arising from Daebo's refusal that could succeed.

**The Corus fixture**

27.    Following Daebo's refusal to perform the Carboex fixture, ABT ordered the ship to load a cargo of non-bituminous coal for Immingham under a sub-charter referred to as the Corus fixture. Daebo again took the position that this fixture could not be completed by 27 May. It may not be without significance that it was only in their reply submissions that ABT suggested for the first time that Daebo were in breach by refusing to perform this fixture; and in their closing submissions, referring to Daebo's expert's calculations as to the estimated duration of this fixture (which he calculated would complete on 28 May) they said:

> Even if this estimate is correct, the fact remained that it was only one day after the end of the charterparty period...
>
> In view of the differences between the estimated voyage lengths, and in view of the fact that the alternative business being proposed in the circumstances of [ABT's] mitigation of [Daebo's] breach, there was a second breach... when [Daebo] wrongly refused to perform the Immingham voyage.

9

28. We are not sure what, if anything, to make of these submissions. ABT made no attempt to criticise the conclusion that 28 May was the estimated date of completion for the Corus business. In those circumstances, the fact that it was only one day later than the latest redelivery date is neither here nor there: in such circumstances one day is as good (or bad) as one year. And the relevance of the other matters referred to simply escapes us.

**ABT's counterclaim**

*The additional hire*

29. As we have already said, on about 7 May 2008 the parties agreed to extend the last date for redelivery to midnight on 8 June 2008 in exchange for an increase in the rate of hire payable by ABT from $70,000 to $100,000 per day from 7 May until redelivery. ABT said that the additional hire which they had to pay should be recoverable either as the costs to them of mitigating their losses or on the basis that no benefit can be claimed by a party from its own breach of contract; and they also argued that a variation was entered into under economic duress and was therefore voidable.

30. The short answer to the first two points is that Daebo were not in breach of charter; but there would in any event have been other insuperable difficulties in ABT's way. As regards recovery as the costs of mitigation, ABT could not have shown that they acted reasonably in entering into the variation since there was no evidence that they considered what other options were available to them; they would inevitably have needed to renegotiate the charter in order for the ship to perform the Corus fixture; they would not have been able to show that the variation was entered into as a result of the refusal to undertake the Carboex voyage as distinct from their own breach in instructing the ship to perform a voyage

10

which could not be performed lawfully within the redelivery time, and in any event they did not provide the material which would have enabled a proper calculation to be made of the consequences of the ship not performing the Carboex fixture.

31. As regards the alleged principle that no benefit can be claimed by a party for its own breach of contract, we accept Daebo's case that there is no such intractable principle, that the principle in the *Alghussein* case does not apply here and that there is no reason why a clear agreement between the parties entered into as a result of a (for these purposes assumed) breach by one of those parties should not be applied.

*Economic duress*

32. That leaves ABT's case on economic duress. For this to get off the ground, ABT would have had to show some illegitimate pressure. Given, however, that Daebo were entitled to refuse to perform the Corus fixture, they could not show this. In the absence of unusual circumstances, the fact that a party relies on existing contractual rights to drive a hard bargain does not amount to economic duress, and there were no such unusual circumstances here. Nor were any alleged. Even if that had not been the case, Daebo's conduct here was perfectly within the boundaries of ordinary and legitimate commercial pressure: both they and the head owners genuinely believed that the ship would not be redelivered in time and thus acted *bona fide* in adopting the position they did.

33. In their closing submissions, ABT sought to place reliance upon an intimation by the head owners that they would claim damages of $25 million if "Nicole" was redelivered late. However, that did not cause ABT to enter into the variation. The head owners' statement was made on 22 April, more than two weeks before the variation was negotiated, and in the meantime ABT continued to insist on the

11

Corus fixture being performed.  They were obviously not troubled by any risk of the alleged damages claimed.  In addition, the message threatening that claim was sent direct by the head owners' broker to ABT's broker and did not emanate from Daebo, so if there was any illegitimate pressure it did not come from them.

34.    There is a further, fatal, point: namely that ABT affirmed the variation agreement and cannot now resile from it.  On 13 May, ABT gave formal voyage instructions which indicated that "Nicole" was not expected to berth at the loading port until about 22 May, so at that stage they must have known that the voyage could not be completed by 27 May.  Yet there was no suggestion at that time that there had been any illegitimate pressure applied by Daebo.

35.    What this means is that ABT gave instructions which were only consistent with the variation being valid and of binding effect at a time when the alleged economic duress no longer existed.  Further, they continued to act on the basis that the agreement was binding by making hire payments on the basis of it, supported by appropriate hire statements, without any protest or reservation of rights and without indicating that they intended to challenge their obligation to pay hire at that rate or to reclaim any part of it.  For these reasons, even if (contrary to our primary conclusion) the variation agreement was voidable, the charterers cannot now avoid it.

36.    It remains for us to consider three minor counterclaims.

*The underperformance claim*

37.    The charterers claimed $23,524.82 on the basis that there was underperformance on a voyage from Ponta Madeira to the South West Pass.  They relied upon an AWT report.  Daebo's first response was that there was no speed or consumption warranty in the charter and therefore no claim could lie.  This was because in

12

Appendix A to the charter, which set out the description of the ship's performance, appeared the words "all details about and without guarantee".

38.   ABT sought somehow to suggest that the charter did not accurately reflect the parties' agreement.   However, they did not claim rectification, a failure which itself would seem to be fatal to this contention.   In any event, there was no basis for the argument. The fixture recap, although not containing the phrase in question, confirmed that all the terms and details were to be as per the "BTB" charter, i.e. the head charter which itself incorporated the "without guarantee" provision.   That is enough to dispose of this point.

39.   In addition, the AWT report did not approach the matter properly. ABT referred to Daebo's criticisms of this report as being "doubtless well-trodden".   Whilst that description may be correct, if somewhat sarcastic, it is right because the criticisms are right.   So, even absent the "without guarantee" point, ABT had no basis for this claim.

*Off-hire at Wilhelmshaven*

40.   ABT contended that there were delays in discharging at Wilhelmshaven because the Davant cargo was excessively wet. They contended that the ship was consequently off hire and claimed $45,580.58 in this respect.

41.   Whilst pointing out that certain of the periods during which time appeared to have been lost at Wilhelmshaven had nothing to do with the problem relied upon by ABT, Daebo said that in any event the ship was not responsible and that there was no question of off-hire.   The cargo was wet because it was loaded during rain, a fact for which ABT were responsible; there was no failure on the part of the ship to discharge any excess water which accumulated in the holds, and in any event ABT could not bring themselves within the

13

off hire clause because they could not show that the full working of the ship was prevented: rather it was the working of shore equipment that was hindered.

42.   We have no hesitation in finding for Daebo on this part of the case too.   There was simply no evidence to support ABT's case, and they could not get themselves within the off-hire clause.   At a late stage, in their closing submissions, they sought to argue that Daebo were bailees of the cargo and it was therefore for them to show why the alleged difficulties arose.   However, there was no situation of bailment here, ABT had no right to the cargo, and in any event the concept of bailment could not affect the burden of proving an off-hire cause, which remained with ABT.

*Off-hire at Flushing*

43.   In order to reach Wilhelmshaven the ship had to pass through a sulphur oxide emission control area in which the burning of high sulphur fuel oils was prohibited under MARPOL.   Daebo said that ABT failed to provide suitable oil, rather insisting that "Nicole" proceed through the area whilst burning high sulphur fuel oil.   That the ship refused to do and she called at Flushing to take on some low sulphur fuel oil.   ABT contended that she was off hire during that call.

44.   In their earlier submissions in the arbitration, ABT had argued that there was a breach of implied term of the charter by the owners in failing to request bunkers in a timely manner, and that no low sulphur oil was available for timely delivery.   They did not, no doubt advisedly, pursue those arguments in their closing submissions, but they did persist in saying that the ship should have proceeded through the relevant zone in any event because they had offered an indemnity.   However, as Daebo argued, it seems to us highly likely that any such indemnity would have been void for illegality, and in

14

any event a ship cannot be required to ignore environmental regulations. As Daebo's expert said, no reasonably prudent owner would countenance a deliberate breach of MARPOL. Accordingly, ABT's claim to put the ship off hire at Flushing fails, along with all their other contentions in this arbitration.

**Conclusion**

45.   We have not found it necessary to deal with a number of the arguments advanced by the parties in their closing submissions, having regard to the decisions which we have reached on the points dealt with above.   Many of those other arguments related to attempts by ABT to raise prejudicial matters which, in any event, could not have affected the analysis of the disputes.   Others arose from unsupported assertions made on behalf of ABT which, because of their lack of any foundation, need not be given any attention.

46.   In the result, Daebo's claim succeeds in full and ABT's counterclaim is dismissed in its entirely.   We have awarded Daebo interest and costs in the usual way.

**GIVEN** under our hands this 13^ day of March 2012.

.......................................
Bruce Harris

.......................................
Witness

.......................................
Timothy Rayment

.......................................
Witness

4

# EXHIBIT 3

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

Selected Entity Name: AMERICAS BULK TRANSPORT LIMITED
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | AMERICAS BULK TRANSPORT LIMITED |
| **DOS ID #:** | 2134115 |
| **Initial DOS Filing Date:** | APRIL 16, 1997 |
| **County:** | NEW YORK |
| **Jurisdiction:** | LIBERIA |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE
NEW YORK, NEW YORK, 10018

**Chairman or Chief Executive Officer**
DON P DUNSTAN
14 PAR LA VILLE PLACE
HAMILTON, BERMUDA, 00000

**Principal Executive Office**
AMERICAS BULK TRANSPORT LIMITED
80 BROAD STREET
MONROVIA, LIBERIA, 00000

**Registered Agent**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE SUITE 1804
NEW YORK, NEW YORK, 10018

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be

listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| No Information Available | | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| APR 16, 1997 | Actual | AMERICAS BULK TRANSPORT LIMITED |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                              New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS
Homepage  |  Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

Selected Entity Name: AMERICAS BULK TRANSPORT (BVI) LIMITED
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | AMERICAS BULK TRANSPORT (BVI) LIMITED |
| **DOS ID #:** | 3736096 |
| **Initial DOS Filing Date:** | OCTOBER 27, 2008 |
| **County:** | NEW YORK |
| **Jurisdiction:** | BRITISH VIRGIN ISLANDS |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE SUITE 1804
NEW YORK, NEW YORK, 10018

**Registered Agent**

SAMUEL REIN, ESQ.
570 SEVENTH AVENUE
SUITE 1804
NEW YORK, NEW YORK, 10018

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| OCT 27, 2008 | Actual | AMERICAS BULK TRANSPORT (BVI) LIMITED |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                         New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

Selected Entity Name: PHOENIX BULK CARRIERS LIMITED
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PHOENIX BULK CARRIERS LIMITED |
| **DOS ID #:** | 2134159 |
| **Initial DOS Filing Date:** | APRIL 16, 1997 |
| **County:** | NEW YORK |
| **Jurisdiction:** | LIBERIA |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN, ESQ
45 WEST 45TH STREET
13TH FLOOR
NEW YORK, NEW YORK, 10036

**Chairman or Chief Executive Officer**
TREVOR J WILLIAMS
14 PARK LA VILLE RD
HAMILTON, BERMUDA, 00000

**Principal Executive Office**
PHOENIX BULK CARRIERS LIMITED
80 BROAD ST
MONDOVIA, LIBERIA, 00000

**Registered Agent**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE, SUITE 1804
NEW YORK, NEW YORK, 10018

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the

chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| APR 16, 1997 | Actual | PHOENIX BULK CARRIERS LIMITED |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS
Homepage   |   Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

---

Selected Entity Name: PHOENIX BULK CARRIERS (BVI) LIMITED
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PHOENIX BULK CARRIERS (BVI) LIMITED |
| **DOS ID #:** | 3736091 |
| **Initial DOS Filing Date:** | OCTOBER 27, 2008 |
| **County:** | NEW YORK |
| **Jurisdiction:** | BRITISH VIRGIN ISLANDS |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE SUITE 1804
NEW YORK, NEW YORK, 10018

**Chairman or Chief Executive Officer**
ARTHUR E.M. JONES
4 INWOOD DR - LOVERS LANE
PAGET PARISH, BERMUDA, 00000

**Principal Executive Office**

PALM GROVE HOUSE
ROAD TOWN
TORTOVA, BOLIVIA, 00000

**Registered Agent**

SAMUEL REIN, ESQ
570 SEVENTH AVENUE
SUITE 1804
NEW YORK, NEW YORK, 10018

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the

chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| OCT 27, 2008 | Actual | PHOENIX BULK CARRIERS (BVI) LIMITED |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                           New Search

Services/Programs | Privacy Policy | Accessibility Policy | Disclaimer | Return to DOS
Homepage | Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

Selected Entity Name: ALLSEAS LOGISTICS LTD.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ALLSEAS LOGISTICS LTD. |
| **DOS ID #:** | 3099056 |
| **Initial DOS Filing Date:** | SEPTEMBER 07, 2004 |
| **County:** | NEW YORK |
| **Jurisdiction:** | BRITISH VIRGIN ISLANDS |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN ESQ
570 SEVENTH AVE STE 1804
NEW YORK, NEW YORK, 10018
**Chairman or Chief Executive Officer**
JONATHAN B WALK
PO BOX 2257
HAMILTON, BERMUDA, HMJX
**Principal Executive Office**
ALLSEAS LOGISTICS LTD.
14 PAR LAVILLE ROAD
HAMILTON, BERMUDA, HMJX
**Registered Agent**
NONE

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,

directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

### *Stock Information

**# of Shares      Type of Stock      $ Value per Share**
No Information Available

*Stock information is applicable to domestic business corporations.

### Name History

**Filing Date   Name Type        Entity Name**
SEP 07, 2004  Actual        ALLSEAS LOGISTICS LTD.

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results               New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS
Homepage  |  Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2012.

Selected Entity Name: BULK OCEAN SHIPPING COMPANY (BERMUDA) LTD.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | BULK OCEAN SHIPPING COMPANY (BERMUDA) LTD. |
| **DOS ID #:** | 4269935 |
| **Initial DOS Filing Date:** | JULY 12, 2012 |
| **County:** | NEW YORK |
| **Jurisdiction:** | BERMUDA |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
SAMUEL REIN, ESQ.
570 SEVENTH AVENUE
NEW YORK, NEW YORK, 10018

**Registered Agent**

NONE

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUL 12, 2012 | Actual | BULK OCEAN SHIPPING COMPANY (BERMUDA) LTD. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

<u>Search Results</u>          <u>New Search</u>

<u>Services/Programs</u>  |  <u>Privacy Policy</u>  |  <u>Accessibility Policy</u>  |  <u>Disclaimer</u>  |  <u>Return to DOS Homepage</u>  |  <u>Contact Us</u>

# EXHIBIT 4

김상목

| | |
|---|---|
| 보낸 사람: | ONC LINE CO.,LTD. SEOUL [onc@oncline.com] |
| 보낸 날짜: | 2007년 10월 10일 수요일 4:38 |
| 받는 사람: | 대보해운 |
| 제목: | MV ANAGEIA/ACCT. DAEBO (CLEAN RECAP) |

===============================
ONC LINE CO., LTD. SEOUL
TEL : 82-2-732-9200
FAX : 82-2-732-9202
MOB: 82-11-395-1514
E-MAIL : onc@oncline.com
===============================


김상목 과장님


RE MV ANAGEIA/ACCT DAEBO (CLEAN RECAP)
==

PLSD TO RECAP THIS CLEAN-FIXTURE ASF:


1. MV ANAGEIA / OPEN KIMITSU 12/14 OCT 2007
LIBERIAN FLAG, PORT OF REGISTRY: MONROVIA
CRANED BULKCARRIER
BUILT 03.1982, OSAKA SHIPBUILDING CO., LTD., JAPAN
CLASSED: HIGHEST CLASS RUSSIAN MARITIME REGISTER OF SHIPPING
P+I CLUB: STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LTD. LONDON
GT/NET 23,521.00/13,420.00
SUEZ    25,226.05/22,172.08
PANAMA 25,527.00/19,375.00
DWAT 39,416 MT ON 11.676 M SSW
LOA 188.62 / BEAM 28.40 M
GRAIN 50,805 CBM, HOLDWISE:
1/8376 2/10941 3/10663 4/10873 5/9946
BALE 49,882 CBM, HOLDWISE:
1/8159 2/10770 3/10463 4/10694 5/9796
MCGREGOR FOLD HATCH COVERS.
VESSEL IS SUITABLE FOR GRAB DISCHARGE.
4 CRANES, 25 MTONS EACH.
SPEED/DAILY CONS. M.E.
BASIS GOOD WEATHER CONDITIONS BEAUFORT FORCE 4 DOUGLAS
SEA STATE 3 AND NO ADVERSE CURRENTS
ABOUT 13.0 K on 26MT IFO(180 CST RME25) PLUS ABT 2.5 MT MDO(DMB)
IN PORT IDLE ABT 2.5 MT MDO (DMB) GEAR WORKING ABT 4.0MT
MDO (DMB)
VESSEL BURNS MDO WHEN MANOEUVERING IN PORTS NAVIGATING

"ALL DETS GIVEN IN GOOD FAITH "ABOUT" WITHOUT GUARANTEE"

FOR

2. OWNERS: AMERICAS BULK TRANSPORT LTD. MONROVIA, LIBERIA
3. CHTRS : DAEBO SHIPPING CO., LTD, SEOUL
4. DELY : DLOSP KIMITSU, JAPAN ATDNSHINC
5. L/CAN  0001HRS 12TH – 2400HRS 16TH OCTOBER 2007 LMT
6. 1 t/c trip via sbs, sas, sps, aa, awiwl with steel products and
hless/not imdg cgos (int steel pipe/coil/bar etc).
7. REDEL DLOSP 1SP US GULF ATDNSHINC PICO (INT BROWNSVILLE/NOLA RNG)

8. HIRE: USD 44000 DIOT. SHOULD THE VESSEL NOT BE REDELIVERED BY 0001
HOURS GMT ON THE 91ST DAY OF THE T/C, HIRE TO BE INCREASED TO USD
48000 DIOT UNTIL REDELIVERY.

9. Hire Payments to be made as per Owners' head c/p

10. Charterers not to deduct Owners expenses from hire unless Charterers
inform Owners of the expenses in advance, and Owners agree for same to
be deducted from the hire.

11. Bunkers: On dlvry, about 800–850 mts IFO and about 135 mts mdo.
Quantities on redelivery to be same as actual quantities on delivery.
– Prices bends: USD 445/mt ifo and usd 745/mt mdo

12. ILOHC: USD 5000 l/s excluding dunnage/lashing removal.
13. c/v/e: USD 1,500 pmpr
14. HOLD CLEANLINESS: ON ARRIVAL FIRST LOAD PORT, VESSEL'S HOLDS TO BE
SWEPT AND WASHED DOWN BY FRESH WATER AND DRIED UP SUFFICIENTLY
TO LOAD CHARTERERS' INTENDED CARGO.SHOULD THE VESSEL FAIL HOLD INSPECTIONS
AT THE FIRST LOADING PORT, THE VESSEL SHALL BE CONSIDERED OFF HIRE
FROM THE TIME OF FAILURE UNTIL THE TIME THE VESSEL PASSES RE-INSPECTIONS.
15. 3.75 PCT ADCOM TO CHTRS + 1.25 PCT TO ONCLINE + 1.25 PCT TO PERACO

16. OTHER TERMS/CONDITIONS AS PER OWNS BTB HEAD C/P

CARGO EXCL:

LIVESTOCK, ARMS/AMMUNITIONS, HOT BRIQUETTED IRON, SPONGE IRON, DIRECT REDUCED IRON ORE,
BRIQUETTES OF ANY KIND, ASPHALT, TAR, INFLAMMABLE GOODS, HAZARDOUS GOODS, EXPLOSIVES,
BLACK POWDER, BLASTING CAPS, DETONATOR CAPS, POND COAL, PITCH, SODA ASH, CONCENTRATES,
SULPHUR, FISH MEAL, PETCOKE, ACIDS, CALCIUM CARBIDE, AMMONIUM NITRATE, LOGS, SALT, NAPHTHA,
SCRAP, MOTOR BLOCKS, TUNINGS, CALCIUM HYPOCHLORIDE, BITUMEN, MINERAL SAND,
NUCLEAR MATERIALS, PRODUCTS OR WASTE, ZINC ASHES, REDIOACTIVE MATERIALS PRODUCTS OR WASTE,
FERRO SILICON, COPRA AND ITS PRODUCTS, CREOSOTED GOODS, PETROLEUM AND ITS PRODUCTS,
MOTOR SPIRITS, CAUSTIC SODA, ASBESTOS, HIDES, BORAX IN BULK, CHARCOAL, COMBUSTIBLE MATERIALS,
OILY EXPELLERS, TURPENTINE, OIL SEED CAKES, FIREWORKS, CEMENT, CEMENT CLINKER, RESINS,
SUNFLOWER SEED EXPELLERS, INDUSTRIAL CHEMICALS OR WASTE, TOXIC CHEMICALS OR WASTE

++END RECAP

TKS FOR YR WAMREST SUPPORT TO LEAD THIS CLEAN FIXTURE.
TRUST THAT THIS RECAP IS ALL IN GOOD ORDER WITH NEGO.

BRGDS/김철훈 배상

외화송금 발신 전문 사본

外換銀行

지점명  광화문지점
TEL: 02)739-3101
일 자 : OCT. 17TH, 2007   14:39   송미정      연서대상

| : 수신은행(TO    ) | : KEB USA INTERNATIONAL CORP.          (KOEXUS8N    ) |
|---|---|
| :20 거 래 번 호 : (SENDER'S REFERENCE) | 0118-OTT-071001102 |
| :32A 일 자 및 송금 액 (VAL/CUR/AMT) | 071017/USD/******1,137,632.54 |
| :50A 보 내 시 는 분 (ORDERING CUSTOMER) | DAE BO SHIPPING CO., LTD      DANGJU-DONG JONGNO-GU SEOUL KOREA 7FL                                 ID.NUMBER : 99910281***** |
| :57A 수취인 거래은행 (ACCOUNT WITH BANK) | :BBDABMHM   (SWIFT BIC) ** ** 희중수취은행 * BANK OF BERMUDA, HAMILTON      6 FRONT STREET P.O. BOX HM 1020                HAMILTON HM DX |
| :59A 받 으 실 분 (BENEFICIARY CUSTOMER) | /010097574501 ALLSEAS LOGISTICS |
| :70 송 금 내 역 (REMITTANCE INFORMATION) | MV.ANAGEIA 1ST HIRE |
| :71A 결제은행수수료부담자 (DETAILS OF CHARGES) | SHA |
| :72 기 타 지 시 사 항 : (SENDER TO RECEIVER (INFORMATION) | |

| 외화총액        USD | 1,137,632.54 | 순대체금액   USD | 1,137,632.54 |
|---|---|---|---|
| 가산정수) 송금수수료 | KRW 25,000 | 전신료   KRW | 8,000 |
| | | (수수료 합계   KRW | 33,000) |
| 현금/외국통화 33,000 | 작기앞/순대체 | 대체 합계금액 KRW | 33,000 수납 |
| | 1,137,632.54 | USD | 1,137,632.54 수납 |

< 자동선정건 >
고객번호 : 99910281*****,  지정항목 : 00,  보고서 : 261-333

※ 동일한 내용으로 송금을 원하시는 경우 이 사본을 제시하시면 보다 신속히 처리됩니다.
   (It would be processed faster if you bring this copy in case the remittance is made the same as this time.)
※ 인터넷뱅킹 등록 고객은 인터넷을 통하여 보다 편리하고 동일한 내용으로 송금할 수 있습니다.

www.keb.co.kr

EC-A-FM-035(1)/2((2007. 3. 개정 210×297)

 KEB 외환은행  First Choice Bank

# EXHIBIT 5

**From:** Bob McCullough [tornav@bellnet.ca]
**Sent:** Tuesday, August 19, 2008 12:01 PM
**To:** Ed Coil; lmonteiro@nmlp.com; giovanni; dancira@amt-usa.us
**Cc:** tornav; Barbara Gradley
**Subject:** AMT/ Phoenix CP dated Aug 18,2008

Ed
Pls find below recap to AMT/ Phoenix fixture, pls review and revert with comments


Charterer- America Metals Trading LLP,
            London, UK

Shipowner- Phoenix Bulk Carriers Limited
            Monrovia, Liberia

Vessels- Suitable SDBC, Classed Lloyds 100A1 or equivalent
            max 18 years

Cargo- 70,000 MT 5% MOLOO Pig Iron
            Shipowner to declare quantity on nominating performing vessel or
            min 10 days prior to commencement of Laydays

Loading - 1 SB Ponta de Madiera, Brazil

Discharging - 1 SB OR SA CHOPT Mississippi Rvr not above Baton Rouge

Laydays- Sept 25- Oct 10, 2008
Loading/ Discharging- 15,000 MT per WWD SHINC BENDS

Notice of Readiness- To be tendered ATDNSHINC, WIBON

Freight- $                     ST

Demurrage/ Despatch- to be mutually determined on day of fixing performing vessel but shall be relative to $60,000 per day
based on the BPI index at 8,000 Points/ HD

Demurrage/ Despatch to be settled within 30 days of completion of the voyage



Otherwise as per AMT/ Phoenix CP dated Jan 12, 2008 with logical alterations

End

Freight Statement Recap

☒

AMERICA METALS TRADING LLP
c/o TORNAV SHIPPING
Suite 300,125 Lakeshore Rd. East
Oakville, L6J 1H3
Canada

**Phoenix Bulk Carriers ( US) LLC**

88 Valley Road
Middletown, RI 02842
Tel: (401) 846-7790 Fax: (401) 846-1520

Date        9 April 2009

## Freight Recap

**m.v. PLEIADES - C/P 18 August 2008**

Freight:
  67,337.0000 mt pig iron at USD

Demurrage at PONTA DA MADEIRA                                    26,940.80

Despatch at NEW ORLEANS                                        (13,724.00)
Charterers payment 11/14/08
Charterers payment 11/12/08

**Balance in Owners favour**                                       **13,216.80**

E.& O.E.

We ask you kindly to transfer above balance with value November 5, 2008 to:

BANK OF BERMUDA
6 FRONT STREET
HM-08 Hamilton
Bermuda
SWIFT CODE: BBDABMHM
Credit Account: No. 010-813038-501
Beneficiary: Allseas Logistics Bermuda Ltd
Reference: PLEIADES - Com BUL - F000009 - Client 237

ʳs faithfully

# EXHIBIT 6

Freight Statement R~~~~

AMERICA METALS TRADING LLP
c/o TORNAV SHIPPING
Suite 300,125 Lakeshore Rd. East
Oakville, L6J 1H3
Canada

Phoenix Bulk Carriers ( US) LLC

88 Valley Road
Middletown, RI 02842
Tel: (401) 846-7790 Fax: (401) 846-1520

Date    10 October 2008

## Freight Recap

**m.v. CAPTAIN P. EGGLEZOS - C/P 21 January 2008**

Freight:
    73,302.0000 mt pig iron at  _____

Deadfreight:
    248.0000 mt pig iron at   ___  _

Demurrage at PONTA DA MADEIRA                          195,757.80

Demurrage at NEW ORLEANS
Charterers payment 09/22/08                            343,922.35
Charterers payment 09/25/08

Balance In Owners favour                               539,680.15

                                                       E.& O.E.

We ask you kindly to transfer above balance with value September 12, 2008 to:

BANK OF BERMUDA LTD
PAR LA VILLE PLACE
14 PAR LA VILLE ROAD
HM-08 Hamliton HM 08, Bermuda
Bermuda
SWIFT CODE: BBDABMHM
Credit Account: No. 010-097574-501
Beneficiary: Allseas Logistics Ltd
Reference: CAPTAIN P. EGGLEZOS - Com Bul - F000161 - Client 237

file://C:\Documents and Settings\gadecki\Local Settings\Temporary Internet Files\OLK7E\Freight Statem... 3/10/2010

Freight Statement Recap

Page 1 of 2

AMERICA METALS TRADING LLP
c/o TORNAV SHIPPING
Suite 300,125 Lakeshore Rd. East
Oakville, L6J 1H3
Canada

⊠

Phoenix Bulk Carriers ( US) LLC

88 Valley Road
Middletown, RI 02842
Tel: (401) 846-7790 Fax: (401) 846-1520

Date      6 October 2008

## Freight Recap

**m.v. SANTOS SUCCESS - C/P**

Freight:
64,900.0000 mt pig iron .

Demurrage at PONTA DA MADEIRA                                    182,546.00

Despatch at SRIRACHA
Charterers payment 08/13/08

Balance in Owners favour                                        104,003.50

                                                                E.& O.E.

We ask you kindly to transfer above balance with value July 30, 2008 to:

BANK OF BERMUDA LTD
PAR LA VILLE PLACE
14 PAR LA VILLE ROAD
HM-08 Hamilton HM 08, Bermuda
Bermuda
SWIFT CODE: BBDABMHM
Credit Account: No. 010-097574-501
Beneficiary: Allseas Logistics Ltd
Reference: SANTOS SUCCESS - Com Bul - F000134 - Client 237

Yours faithfully
Phoenix Bulk Carriers ( US) Corp.

file://C:\Documents and Settings\gadecki\Local Settings\Temporary Internet Files\OLK7E\Final Freight S...  3/10/2010

# EXHIBIT 7

Carl-Martin
Graff/OSL/TKGroup                    To Tom Bang-Olsen/OSL/TKGroup@TKGroup
01.07.2009 11:15                     cc

                                     bcc

                                 Subject

Reference number: 00564182          Exp. Date: 18.02.2009          Created: 11.02.2009 16

From:        "Corrado Pittaluga" <panamax@ifchor.ch>
To:          chartering@kleveness.com
cc:
Subject:     IRINI / ABT CLEAN RECAP Corrected version
Company:     TKG
Department:  Chartering Baumarine, Chartering Bulkhandling, Operations Baumarine
Notify:
Categories (processed)
Doc-No. 5714700    11/FEB/2009 (WED)   16:42   (+0100)   CP


IFCHOR SA, Lausanne, Switzerland

TO BAUMARINE   - K.A. CARL-MARTIN
TO PHOENIX RIO - K.A. CLAUS

RE IRINI/ABT
------------

revised chrtrs' full style

WE ARE PLSD TO CONFIRM HAVING FIXED CLEAN AS PER YOUR AUTHORITY AS FLLWS:

- PRIVATE AND CONFIDENTIAL

- C/P DD 11.02.2009

IRINI
BULK CARRIER MHL FLAG BLT 1988
69734MT DWT ON 13,26M SSW TPC 65
LOA/BM 225M/32,2M
INTERNATIONAL GROSS/NET: 36177/22518
7/7 HO/HA
GRAIN 2863191,5 CBF
ABT 13,50K ON ABT 29,0MT(B)/ ABT 12,5K ON ABT 29,0MT (L) IFO + ABT 0,0MT
MDO IN PORT IDLE/WORKING: ABT 1,0/ ABT 0,0MT IFO + ABT 1,0/ ABT 1,0MT MDO
IDLE/WORKING ALL DETAILS ABOUT

ALL SPEED AND CONSUMPTION FIGURES ARE AVERAGE FIGURES DURING C/P PERIOD.
ALL SPEED AND ALL CONSUMPTION FIGURES ARE TO BE CONSIDERED AS 'ABOUT'. AT
SEA PERFORMANCE FIGURES ARE CONSIDERED TO BE FROM SEABUOY TO SEABUOY IN
MODERATE WEATHER UPTO/INCLUDING BEAFORT 4.
SEA DOUGLAS STATE 3 NOT IN ADVERSE CURRENT FUEL QUALITY TO BE 380 CST
WITHIN ISO 8217 (E) RMG 35 - 2005 DIESEL QUALITY TO BE DMA WITHIN ISO 8217
- 2005 MARPOL ANNEX VI CLAUSE TO BE INCORPORATED IN CP.

FOR

AMERICAS BULK TRANSPORT (BVI) LIMITED
-------------------------------------

- DELI PASS CAPE PASSERO ATDNSHINC

- LAYCAN 00:01HRS 13 FEB - 12:00HRS 18 FEB, 2009 (LT APPLIES)
  LAST CARGO CORN TO EGYPT ETR EL DEKHEILA 12/13 FEB AGW UCE WP

- 2 LADEN LEGS WITHIN ATLANTIC.
  1ST LEG PIG IRON FROM PDM TO USG/USEC
  2ND LEG TO BE COAL OR GRAINS FROM USEC / USG / COLOMBIA / VENEZUELA

- REDELI DOLSP OR PASSING 1SP CAPE PASSERO/SKAW RGE PICO ATDNSHINC

- HIRE USD 11.000 DAILY INCLOT

- BOD HSFO ABT 950/1.000 MTS MDO ABT 75 MTS
  PRICES HSFO 270 PMT MDO 500 PMT
  SAME PRICES QTTS BENDS
  IF REDEL SECA AREA, VSSL SHOULD HAVE ENOUGH LFSO TO GET SAFELY OUT OF
  SECA AREA

- ILOHC/ITERM HC CLSE:
  "THE CHARTERERS SHALL PAY EXTRA FOR SWEEPING AND/OR WASHING AND/OR
  CLEANING OF HOLDS BETWEEN VOYAGES AND/OR BETWEEN CARGOES PROVIDED SUCH
  WORK CAN BE UNDERTAKEN BY THE CREW AND/OR TIME IS AVAILABLE AND/OR
  WHEATHER CONDITIONS PERMIT AND IS PERMITTED BY LOCAL LABOUR AND/OR
  PORT REGULATIONS, AT THE RATE OF USD 700,- PER HOLD. IN CONNECTION
  WITH ANY SUCH OPERATIONS, THE OWNERS SHALL NOT BE RESPONSIBLE IF THE
  VESSELS'S HOLDS ARE NOT ACCEPTED OR PASSED BY THE PORT OR ANY OTHER
  AUTHORITY AND SURVEY COMPANY. THE CHARTERERS SHALL HAVE THE OPTIONTO
  REDELIVER THE VESSEL WITH UNCLEAN/UNSWEPT HOLDS AGAINST A LUMPSUM
  PAYMENT OF USD 4.500,- IN OF CLEANING EXCLUDING DUNNAGE REMOVAL.

- C-V-E USD 1.250

- SOFT LANDING CLSE AS PER IRINI/ABT. CPARTY DD 07/09/07:
  "PIG IRON TO BE LOADED, STOWED, CARRIED AND DISCHARGED STRICTLY IN
  ACCORDANCE WITH APPLICABLE NATIONAL / INTERNATIONAL REGULATIONS AND/OR
  IMO CODE AND RECOMMENDATIONS AT THE CHARTERERS' RISK AND EXPENSE.
  CHARTERERS ARE ALLOWED TO LOAD PIG IRON PROVIDED THE FIRST LOADS OF
  CARGO IN EACH HOLD TO BE LOWERED AS LOW AS POSSIBLE IN ORDER TO FORM A
  PROPER CUSHION TO MASTER' SATISFACTION IN ORDER TO PROTECT THE TANK
  TOP AGAINST ANY FURTHER DUMPING OF CARGO IN THE HOLDS.
  FURTHERMORE IN BRAZIL, THIS GOES FOR VITORIA, TUBARÃO AND PONTA DA
  MADEIRA, THE LOADING TO BE EFFECTED BY SHIPLOADERS WITH CONVEYOR
  BELTS, WHERE THE PIG IRON COMES OFF THE END OF THE CONVEYOR BELT, FROM
  WHERE IT DROPS INTO THE HOLDS.
  PRIOR TO COMMENCEMENT OF LOADING, THE INITIAL LANDING-SPOTS OF EACH
  HOLD TO BE PROTECTED BY A SUFFICIENT LAYER TO MASTER'S SATISFACTION OF
  WOODEN PALLETS OR PLASTIC BAGS FILLED WITH
  SAWDUST. WHEN THE PIG IRON LANDS ON THE BAGS, THEY ABSORB THE INITIAL
  IMPACT.
  SUBSEQUENTLY, THE PIG IRON IS LOADED ON TOP OF THE PIG IRON ALREADY
  LOADED. IN THIS MANNER, NO CARGO IS LOADED DIRECTLY ONTO UNPROTECTED
  TANK-TOPS."

- 3.75 PCT ADD PLUS 1.25 PCT COMM IFCHOR

- O/WISE AS PER ATTACHED BAUMARINE PROFORMA CP "ANNA/DAEWOO DD
  05/02/09" LOGICALLY AMENDED IN ACCORDANCE WITH ABOVE MTERMS AND
  ALTERATIONS HEREBELOW:

- CLS 47, PARA A) REPLACE "DMI" WITH "AWT".

- CLS 68, PARA A) DELETE "AND COUNTERSIGNED BY A REPUTABLE BANK OR A
  PARENTCOMPANY ACCEPTABLE TO THE OWNERS".

END RECAP

Hire Out Statement LLL

BAUMARINE
c/o IFCHOR GROUP SA
Place Pepinet 1
1003 Lausanne
Switzerland

Phoenix Bulk Carriers (US) LLC

88 Valley Road
Middletown, RI 02842
Tel. (401) 846-7790 Fax: (401) 846-1520

26 February 2009

Dear Sirs

m.v.    Irini - C/P 11 February 2009 - HF00031

On behalf of our Principals, we have instructed
BANK OF BERMUDA 6 FRONT STREET HM-11 Hamilton HM 11, Bermuda Bermuda
to transfer

**USD 436,820.44**

to
DNB NOR BANK ASA
STRANDEN 21
0021 OSLO
Norway
Swift Code:
Account No
Beneficiary: BAUMARINE AS
Yours sincerely
Phoenix Bulk Carriers ( US) LLC
(as agents only)

---

Hire statement 1

m.v.    Irini - C/P 11 February 2009 - HF00031

| Description | USD |
| --- | --- |
| **Hire** | |
| 25/02/09 05:00 hrs - 12/03/09 05:00 hrs (UTC) | |
| 15 days at USD 11,000.00 | 165,000.00 |
| Commission 5 % | (8,250.00) |
| C/E/V - USD 1,250 per month pro rata | 616.44 |
| **Bunkers** | |
| IFO - actual delivery 940.2 mt at USD 270.00 | 253,854.00 |

Hire Out Statement LLL                                                        Page 2 of 2

| | |
|---|---|
| MDO - actual delivery 51.2 mt at USD 500.00 | 25,600.00 |
| **Balance in Owners favour** | **436,820.44** |

E.& O.E.

Page    2

Page 1 of 1

JLA

# DnB NOR

## Detaljer, innkommende SWIFT - overføringer

Dette er kun en forhåndsmelding. Den kan tilbakekalles av betalende bank, og vi tar forbehold om at betalingen ikke blir utført hvis betalende bank ikke krediterer oss for beløpet.

| Betaler | | Mottaker | |
|---|---|---|---|
| Navn: | 1/ALLSEAS LOGISTICS BDA LTD | Navn: | BAUMARINE AS |
| Adresse: | 2/ATTN: DEBORAH L PATERSON | Adresse: | |
| | 2/P O BOX HM 1027 | | |
| | 2/CITY OF HAMILTON PC:HM DX | | |
| | US | | |

**Betalingsinformasjon**

| Konto: | 70910443672 | Valuta: | USD |
|---|---|---|---|
| Valuteringsdato: | 02.03.09 | Foreløpig kurs: | 1,00 |
| Opprinnelig beløp: | 436.813,94 | Opprinnelig valuta: | USD |
| Referansenr.: | 3514231 | Omkostninger: | |
| Referanse: | /INV/IRINI - C/P 11 FEB 2009 /INV/H | Foreløpig beregnet beløp: | 436.813,94 |
| | F00031 | | |
| | BNY CUST RRN - | | |

Foreløpig beregnet beløp kan bli endret på bokføringsdag på grunn av endringer i valutakurs.

*Utskrift ved: ANN-MARGRETHE HUSEBY 02.03.2009 09:51*

BC:6,5                    © DnB NOR

880/14-105

# DnB NOR

Baumarine AS
C/O T KLAVENESS & CO AS
P.O.BOX 183 - SKØYEN
0212 OSLO

Dato 02.03.2009

## KREDITOPPGAVE



| Vi har godskrevet Deres konto | : | | | 7091.04.43672 |
|---|---|---|---|---|
| Beløp | : | | USD | 436.813,94 |
| Valutadato | : | | | 02.03.2009 |
| Mottatt dato | : | | | 02.03.2009 |
| Betalingsreferanse | : | | | 7908NOI03514231 |

| Omkostninger betales av: | Delt - avsender / mottaker | | | |
|---|---|---|---|---|
| Opprinnelig beløp: | | | USD | 436.813,94 |
| Mottatt beløp: | | | USD | 436.813,94 |
| Bankens omkostninger: | NOK | 50,00 | USD | 7,18 |
| Detaljer: | | | | |
| Produktpris: | NOK | 50,00 | | |
| | Omkostningene tas med i belastningsoppgave / faktura | | | |

| Oppdragsgiver | Mottatt fra |
|---|---|
| 1/ALLSEAS LOGISTICS BDA LTD. | IRVTUS3NXXX |
| 2/ATTN: DEBORAH L PATERSON | THE BANK OF NEW YORK MELLON |
| 2/P O BOX HM 1027 | ONE, WALL STREET |
| 2/CITY OF HAMILTON   PC:HM DX | NEW YORK |
| | |
| Melding til betalingsmottaker: | Debitert bank: |
| /INV/IRINI - C/P 11 FEB 2009 /INV/H | IRVTUS3NXXX |
| F00031 | THE BANK OF NEW YORK MELLON |
| BNY CUST RRN - TT FRT035546MNYN | ONE, WALL STREET |
| | NEW YORK |

Grensekryssende betalinger er rapportert til Valutaregisteret i henhold til myndighetskrav